CA 03-1298

**BRENDA R. THIBODEAUX AND LUCIEN G. THIBODEAUX**

**VERSUS**

**DEBBIE M. JURGELSKY, M.D.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 01-C-2216-B
HONORABLE AARON FRANK MCGEE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**BILLIE COLOMBARO WOODARD**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Billie Colombaro Woodard, Oswald A. Decuir, Michael G. Sullivan, and Billy Howard Ezell, Judges.

**REVERSED AND RENDERED.**

**Ezell, J., dissents and assigns written reasons**
**Sullivan, J., dissents for the reasons assigned by Ezell, J.**

Marc W. Judice
Judice & Adley
Post Office Box 51769
Lafayette, Louisiana 70505-1769
(337) 235-2405
Counsel for: Defendant/Appellee
    Debbie M. Jurgelsky, M.D.

David Charles Laborde
The LaBorde Law Firm
Post Office Box 80098
Lafayette, Louisiana 70598-0098
(337) 261-2617
Counsel for: Plaintiffs/Appellants
    Brenda and Lucien Thibodeaux

Katherine Aline Pavy
Attorney at Law
1720 Kaliste Saloom, Suite A-4
Lafayette, Louisiana 70508
(337) 993-1155
Counsel for: Defendant/Appellee
    Debbie M. Jurgelsky, M.D.

Robert Steven Patriquin
Patriquin Law Firm
4076 Gourrier Avenue, Suite 6
Baton Rouge, Louisiana 70808
(225) 769-4715
Counsel for: Plaintiffs/Appellants
    Brenda and Lucien Thibodeaux

WOODARD, Judge.

* * * * *

Ms. Brenda Thibodeaux and her husband, Lucien (Gerard), appeal a trial court judgment which found that her OB/GYN, Dr. Debbie Jurgelsky, did not deviate from the proper standard of care when she performed a total abdominal hysterectomy during a dilation and curettage (D&C) procedure and more specifically, that Dr. Jurgelsky had consent to perform the hysterectomy. For the following reasons, we reverse.

* * * * *

Dr. Jurgelsky had been Brenda's treating OB/GYN since 1991, when Brenda was pregnant with her second child. She delivered the baby by cesarean section (c-section) in August 1991. In 1996, Dr. Jurgelsky, again, cared for Brenda during her third pregnancy, also resulting in a c-section delivery.

Brenda returned to see her, on April 7, 1999, approximately fourteen-and-one-half weeks pregnant. On May 11, 1999, an ultrasound revealed fetal demise. Dr. Jurgelsky estimated that the fetus had been dead for two to three weeks. She and Brenda discussed the situation and scheduled a D&C procedure to remove the dead fetal tissue. During this discussion, Brenda signed a consent form to the D&C procedure.

Brenda was admitted to Opelousas General Hospital on May 14 for the D&C procedure during which Dr. Jurgelsky noticed that she pulled out some fatty tissue with the fetal tissue, which indicated a tear in the uterus. At this point, she left the operating room to inform Brenda's husband of the situation. Basically, she told him that she could try to repair and scrape out as much of the fetal tissue as possible but thought that a hysterectomy was in Brenda's best interest. He signed a consent form for a hysterectomy, and Dr. Jurgelsky proceeded with the operation.

After her release, Brenda had a fever for several days, despite being on antibiotics. She began to have urinary incontinence which became progressively worse. Ultimately, another physician, Dr. Rodosta, determined that the tube to her kidney, the ureter, had been cut and he had to remove one of her kidneys.

Brenda filed a complaint against Dr. Jurgelsky, alleging medical malpractice. In a two to one vote, the medical review panel found that Dr. Jurgelsky did not

commit medical malpractice. Brenda and her husband instituted suit. After a trial on the merits, the trial court dismissed her claims and denied her motion for a new trial. She and her husband appeal the judgment.

\* \* \* \* \*

## BRENDA'S CONSENT

The Uniform Consent Law, within La.R.S. 40:1299.40, provides in pertinent part:

> A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

Accordingly, when a patient signs a form, consenting to a certain procedure and the attendant risks, her signature gives rise to a presumption, though rebuttable, that she has given informed consent to the procedure and is informed of risks.[1] In the instant case, it is important to note the difference between risk and choice since the defense uses the two, as if they are interchangeable, to justify Dr. Jurgelsky's having chosen to perform a hysterectomy when, on the contrary, the two concepts are very different. Basically, a risk is defined as an "expos[ure] to hazard or danger,"[2] such as an infection. "Choice" signifies making a selection between or among options. Therefore, choice is intentional and pro-active, whereas risk is inadvertent. Generally, choice is not something a physician may make absent valid consent unless faced with

---

[1]*Hondroulis v. Schumacher*, 553 So.2d 398 (La.1989).

[2]WEBSTER'S NEW COLLEGIATE DICTIONARY 992 (1981).

2

an emergency.[3]

In the instant case, Brenda signed a consent form for the D&C procedure. The form warned her of certain risks, including "hemorrhage with possible hysterectomy," "perforation of the uterus," and "sterility." "Perforation of the uterus" is a risk that did materialize during the D&C procedure. However, the risk of hemorrhage did not materialize during the procedure to necessitate a hysterectomy.

When Dr. Jurgelsky spoke to Gerard, she was concerned that Brenda may have been hemorrhaging. However, after she opened Brenda's abdomen to repair the uterus, she saw that, in fact, she was not; therefore, a hysterectomy was not warranted due to that circumstance. And, while the consent form informed Brenda that "sterility" was a possible risk of the D&C procedure, in this case, "sterility" did not result from the D&C, but rather, from the unauthorized hysterectomy. In other words, it was a *choice*, among other available options, which Dr. Jurgelsky made. And it was absent an emergency.

Furthermore, Dr. Jurgelsky admitted:

> Q. Did Mrs. Thibodeaux consent to an abdominal – total abdominal hysterectomy on May 11[th] of 1999 [the date she signed the D&C consent form]?
>
> A. No.

Thus, Brenda's signature on the D&C consent form does not create a presumption of valid consent for the hysterectomy and consequent sterility.

**GERARD'S CONSENT**

Dr. Jurgelsky testified that she told Gerard about the perforation of the uterus and explained that there were two options: repairing the uterus or performing a hysterectomy. Gerard told her to do what she thought was best and signed a consent form for a hysterectomy which did list injury to the ureter and leakage of urine through the vagina as possible risks of a hysterectomy.

Notwithstanding, we find that Gerard was not authorized to consent to the hysterectomy. Louisiana Revised Statute 1299.53 provides:

---

[3]*See* La.R.S. 40:1299.40.

A.  In addition to such other persons as may be authorized and empowered, any one of the following persons in the following order of priority, if there is no person in a prior class who is reasonably available, willing, and competent to act, is authorized and empowered to consent, either orally or otherwise, to any surgical or medical treatment or procedures including autopsy not prohibited by law which may be suggested, recommended, prescribed or directed by a duly licensed physician:

> (1) Any adult, for himself.

> . . . .

> (4) The patient's spouse not judicially separated.

Significantly, however, La.R.S. 1299.51 provides:

> The provisions of this Part [Part XXIV - the Louisiana Medical Consent Law] shall not apply in any manner whatsoever to the subjects of abortion and sterilization, which subjects shall continue to be governed by existing law independently of the terms and provisions of this Part.

While the "existing law" concerning sterility is sparse, a review of all pertinent legislation concerning this area leads us to believe that the legislature intended to guarantee an individual patient, alone, the right to make the decision to submit to medical treatment that would effectively end his or her ability to procreate, unless an emergency prevents the patient from having that opportunity.

Moreover, we find this to be consistent with the existing jurisprudential law concerning the authority of one person to consent for another to an operation which renders him or her sterile.  Apparently, the first circuit first addressed the issue in 1978.  In *Beck v. Lovell,*[4] it stated:

> Although our own jurisprudence has never considered the issue, other jurisdictions hold that *absent an emergency*, the relationship of husband and wife does not confer authority for one spouse to grant permission for surgery on another.  We consider the rule reasonable and

---

[4]361 So.2d 245 (La.App. 1 Cir.), *writ denied,* 362 So.2d 802 (La. 1978).

4

well founded. We adopt it as our own and apply it herein.[5]

The procedure for which the husband consented in *Beck* was a tubal ligation. The holding in *Beck* is written in general terms and, presumably, applied to any type of surgery, before the legislature enacted La.R.S. 1299.53, which governs a third party's authority to consent to surgeries and medical treatments in general. However, since the consent provision of La.R.S. 1299.53 is inapplicable to a procedure involving sterilization, the issue of consent is still governed by the law enunciated in *Beck*.

Moreover, we find it of no consequence that Brenda's ovaries are still intact, allowing her to produce eggs. Black's Law Dictionary defines "sterility," as "Barrenness; unfruitfulness; incapacity to germinate or reproduce."[6] "Barrenness" is "the incapacity to bear children,"[7] and "bear" means "to support, sustain, or carry."[8] The removal of Brenda's uterus prevents her from carrying any more children.

We recognize that Dr. Jurgelsky's purpose in performing the operation was not, solely, to render Brenda sterile. Nonetheless, her purpose in performing the operation is relevant only if she was faced with an emergency situation. While she explained that she did not feel that nature could rid the uterus of the fetal products because they had already been there for a long period and, therefore, Brenda *could be* at risk of hemorrhaging, *at some later date*, when the body attempted to rid itself of the retained fetal products, she admitted that it was not an "emergency defined by life threatening immediately; no." Rather, it was a preventative measure that she opted to perform. Every expert physician, who testified, agreed that there were alternatives, including repairing the uterus and terminating the procedure until she could discuss the alternatives with Brenda. Instead, Dr. Jurgelsky chose the most intrusive and drastic alternative. Therefore, neither Brenda's nor her husband's signature on the respective consent forms creates a presumption of valid consent to the hysterectomy.

Nevertheless, this alone does not entitle Brenda to recovery. While the nature

---

[5]*Id*. at 250 (citing *Karp v. Cooley*, 493 F.2d 408 (5th Cir. 1974)) (emphasis added).

[6]BLACK'S LAW DICTIONARY 1414 (6th ed. 1991).

[7]BLACK'S LAW DICTIONARY 151 (6th ed. 1991).

[8]BLACK'S LAW DICTIONARY 154 (6th ed. 1991).

of her claim is one of "no consent," which jurisprudence, historically, deemed a battery, as opposed to "informed consent," our supreme court has found that traditional battery-based liability is now subsumed by negligence-based liability under the Medical Malpractice Act.[9] To prevail in an informed consent action, "a plaintiff must prove more than a failure of consent in order to recover damages."[10] The plaintiff must prove a causal relationship and "that a reasonable patient in the plaintiff's position would not have consented to the treatment or procedure, had the material information and risks been disclosed."[11]

The first prong of the causal relationship is easily met here. Certainly, Dr. Jurgelsky's decision to perform the hysterectomy caused Brenda to be sterile. Further, the hysterectomy, ultimately, is what caused her to endure the nephrectomy. Thus, we must only answer whether "a reasonable patient in the plaintiff's position would have consented to the treatment or procedure, had the material information and risks been disclosed."[12] Our supreme court adopted this objective test of causation to address the potential bias a patient would likely demonstrate when testifying in hindsight.[13]

Dr. Jurglesky testified that she considered Brenda's age, along with the fact that she and Brenda had previously discussed her desire for Gerard to have a vasectomy, when she opted to perform the hysterectomy. However, both Brenda and Gerard testified that they wanted more children or, at least, that they had not yet decided. Furthermore, we believe that a reasonable person would have chosen the least intrusive means of all available alternatives, which every physician testified were available.

Accordingly, we find that Brenda did prove the elements of her lack of informed consent claim and Dr. Jurgelsky is liable for all damages associated with the unauthorized hysterectomy, including the nephrectomy. Our finding that Dr. Jurgelsky lacked consent to perform the hysterectomy compels us to reverse the trial

---

[9]*Lugenbuhl v. Dowling*, 96-1575 (La. 10/10/97), 701 So.2d 447; La.R.S. 40:1299.40(E)(2)(a).

[10]*Capel v. Langford*, 98-1517 (La.App. 3 Cir. 4/28/99), 734 so.2d 835, 843 (citing *Lugenbuhl*, 701 So.2d 447).

[11]*Id.* at 843.

[12]*Id.* at 843.

[13]*Hondroulis*, 553 So.2d 398.

6

court's judgment and pretermits an analysis of whether Dr. Jurgelsky, otherwise, breached the standard of care. We now turn to the quantum of damages.

**DAMAGES**

Because of the trial court's decision that Dr. Jurgelsky did not commit medical malpractrice, it did not address the issue of damages. Nevertheless, since we have a complete record from which to calculate damages, we now address this issue.[14]

Brenda's petition alleges damages for pain and suffering, mental anguish and distress, loss of enjoyment of life, medical expenses, and emotional and psychological injuries associated with her inability to have any more children and the loss of her left kidney.

Gerard also alleges damages for the loss of opportunity to have any more natural children with his wife and for the mental distress caused by his additional concern for his wife's health, given the loss of one of her kidneys.

*Special Damages*

"Special damages are those which can be fixed to pecuniary certitude,"[15] and include past and future medical expenses. After reviewing Ms. Thibodeaux's medical bills, we award her $46,150.00 in past medical expenses. To prove future medical expenses, medical testimony must establish the necessity of future treatment along with its probable costs.[16] However, the record does not support this award.

*General Damages*

Normally, we review a quantum of damages for an abuse of discretion and if we find such an abuse, we are confined to awarding the lowest amount that the trial

---

[14]La.Code Civ.P. art. 2164; *Ayres v. Beauregard Elec. Co-op Inc.*, 94-811 (La.App. 3 Cir. 9/6/95), 663 So.2d 127, *writs denied*, 95-2432, 95-2434 (La. 12/15/95), 664 So.2d 455.

[15]*Knepper v. Robin*, 99-95, p.12 (La.App. 3 Cir. 11/17/99), 745 So.2d 1248, 1255, *writ granted in part*, 99-3572 (La. 2/18/00), 754 So.2d 955 (citing *American Druggists Ins. Co. v. Henry Contracting, Inc.*, 505 So.2d 734 (La.App. 3rd Cir.1987), *writ denied*, 511 So.2d 1156 (La.1987)).

[16]*Knepper*, 745 So.2d 1248.

court could have reasonably awarded when the award is insufficient and the highest amount where the trial court has awarded an excessive amount.[17] However, since the trial court did not award any damages in the instant case, we are not bound by these restrictions.[18]

General damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty.[19] They "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms."[20]

In the instant case, Brenda endured the pain and suffering inherent in the recovery from the surgical procedures, as well as the inability to bear more children, and she suffers the additional risks involved with having only one kidney. In assessing damages associated with the hysterectomy, we consider that she was thirty-seven years old at the time of the surgery and that she and Gerard had three children prior to the hysterectomy. Nevertheless, we cannot discount the seriousness of foreclosing her option of bearing an extended family. We find an award of $50,000.00 for her pain and suffering to be appropriate associated with her hysterectomy.

For her pain and suffering associated with the nephrectomy, we award $50,000.00, for a total award of $100,000.00 in general damages.

### GERARD'S CLAIM

Gerard seeks damages for his own loss of not being able to have any more children with his wife and the mental distress caused by his concern for her health should her remaining kidney be compromised in the future. We do not find the latter to be a compensable damage because his concern, though genuine, is not sufficient to warrant damages; rather, only mental anguish that is severe, debilitating, and

---

[17]*Coco v. Winston Indus.*, 341 So.2d 332 (La.1976); *Reck v. Stevens*, 373 So.2d 498 (La.1979).

[18]*Mart v. Hill*, 505 So.2d 1120 (La.1987).

[19]*Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70.

[20]*Duncan v. Kansas City S. Ry. Co.*, 00-66 (La. 10/30/00), 773 So.2d 670, *cited in LeBleu v. Safeway Ins. Co. of La.*, 01-1637 (La.App. 3 Cir. 5/22/02), 824 So.2d 422.

foreseeable may be compensable.[21] However, we award him $25,000.00 for his loss occasioned by his wife's hysterectomy.

## CONCLUSION

We find that Dr. Jurgelsky performed Brenda's hysterectomy without consent and is liable for the consequent damages. Thus, we reverse the trial court's judgment and award Brenda $46,150.00 in special damages and a total of $100,000.00 in general damages. Further, we award Brenda's husband, Gerard, general damages of $25,000.00. We cast the costs of this appeal on Defendant/Appellee, Dr. Jurgelsky.

**REVERSED AND RENDERED.**

---

[21]See La.R.S. 2315.6(B).

BRENDA R. THIBODEAUX AND LUCIEN G. THIBODEAUX

VERSUS

DEBBIE M. JURGELSKY, M.D.

**EZELL, J., dissenting.**

I dissent from the majority opinion because I find that Brenda's husband

Gerard, did in fact have the right to consent to a hysterectomy on Brenda's behalf

pursuant to La.R.S. 1299.53. I recognize that La.R.S. 1299.51 provides that this

provision of the Louisiana Medical Consent Law does not apply to the subjects of

abortion and sterilization. However, I find that no sterilization procedure was

performed in this case.

Dr. Jurgelsky testified extensively regarding her decision that a hysterectomy

was warranted in this case, which was not for the purpose of sterilization but due to

the possibility of hemorrhage and potential serious future complications. She

explained that once she noted fatty tissue during the D&C procedure, she was required

to open the abdomen to explore the possibility that Brenda may now be bleeding

internally. She stated that Brenda was not a good candidate for laparoscopy to repair

the perforation and to explore for other problems because she had two previous c-

sections with the potential risk of scar tissue formation, making a laparoscopic

procedure difficult. Dr. Jurgelsky deemed it necessary to perform a hysterectomy

because she did not feel that nature could rid the uterus of the fetal products because

they had already been there for a long period. She opined that Brenda was at risk of

1

hemorrhaging when the body attempted to rid itself of the retained fetal products. It was at this point that Dr. Jurgelsky left the operating room to explain the situation to Brenda's husband Gerard.

Dr. Jurgelsky testified that she told Gerard about the perforation of the uterus, which was listed as a risk of this surgery on the consent form, and all other doctors who testified agreed that it does happen on occasion with this type of procedure. She explained that there were two options, repairing the uterus or performing a hysterectomy. Dr. Jurgelsky further told Gerard that the D&C procedure on Brenda had been a very complicated one because the fetal products were so enmeshed in the lining of the uterus that she had a hard time removing them and could not even get all of it. She told him that she was concerned that if she repaired the uterus and left the remaining fetal products that she could not remove, that there was a possibility that Brenda could eventually bleed to death when the body naturally tries to get rid of this tissue, as it will continue to bleed when the tissue stays stuck. Dr. Jurgelsky also explained to Gerard that she and Brenda had discussions about Brenda having problematic periods and that she did not want to have any more children and that she knew he did not want to have a vasectomy. Gerard told her to do what she thought was best. He then signed a consent form for a hysterectomy which listed injury to the ureter and leakage of urine through the vagina as possible risks.

There is no definition in the law of "sterilization." As can be seen from the following medical definitions, tubal ligations are the most often used form of sterilization in a female. Hysterectomies are most often performed for purposes of medical treatment and not sterilization.

18 TABER'S CYCLOPEDIC MEDICAL DICTIONARY 1831 (1997), defines "sterilization" as:

**2.** The process of rendering barren. This can be accomplished by the

2

surgical removal of the testes or ovaries (castration) or inactivation by irradiation, or by tying off or removing a portion of the reproductive ducts (ductus deferens or uterine tubes). SEE: *salpingectomy; tubal ligation; vasectomy.*

Hysterectomy is defined as the "[s]urgical removal of the uterus through the abdominal wall or vagina. The presence of benign or malignant tumors is the most frequent reason for hysterectomy." Id. at 953.

The purpose of the hysterectomy in this case was for medical treatment and not sterilization. Dr. Jurgelsky deemed a hysterectomy necessary to prevent complications given Brenda's past medical history and the complications that arose during the D&C procedure. I do not agree with the majority that Dr. Jurgelsky's purpose in performing the operation is relevant only if she was faced with an emergency situation. Section 1299.53(A) does not require that an emergency be present for a spouse to consent, only that it be "suggested, recommended, prescribed, or directed by a duly licensed physician . . . ." The evidence is clear that Dr. Jurgelsky considered all circumstances and found that a hysterectomy was medically appropriate under the circumstances. For these reasons, I find that Gerard could consent to the hysterectomy.

The Thibodeauxs also complained that the trial court erred in finding that Dr. Jurgelsky did not breach the standard of care in her performance of the hysterectomy. I find that the testimony and medical evidence in the record support the trial court's determination that Dr. Jurgelsky did not breach the standard of medical care in performing a hysterectomy on Brenda.

> A physician is required to exercise that degree of skill ordinarily employed under similar circumstances by others in the profession and also to use reasonable care, diligence, and judgment. A physician is not required to exercise the highest degree of care possible; rather, his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. In a medical malpractice action, the plaintiff has the burden of proving, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected

3

of a physician in his medical specialty; and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained.

*Fusilier v. Dauterive*, 00-151, p. 7 (La. 7/14/00), 764 So.2d 74, 79 (citations omitted).

One of the three doctors on the medical review panel opined that Dr. Jurgelsky deviated from the standard of care because there were other options short of a hysterectomy that should have been considered. Dr. Felton Winfield, an OB/GYN, testified that he would have completed the procedure, made sure the patient was stable, and repair the damage. He would have examined Brenda laparoscopically to see if there was damage to other structures. Dr. Winfield stated that he would not perform a hysterectomy even if he did not think all fetal products were removed because most products are passed with bleeding afterwards.

Dr. Jose Dora, another OB/GYN, also served on the medical review panel but found that Dr. Jurgelsky did not breach the standard of care in this case. Dr. Dora testified that repairing the tear and leaving the fetal products left too many potential complications, including infection, bleeding, disseminated intra vascular coagulation, postoperative complications with peritonitis, sepsis, and life threatening fevers. He stated that knowing the facts of this case, including possible contraception, he would have proceeded with a hysterectomy. It was his opinion that given Brenda's medical history, discussions of possible contraception, advanced maternal age of thirty-seven years, and the fact that the abdomen had to be opened to check for involvement of other structures from the tear, he would have probably performed a hysterectomy. He opined that a hysterectomy was the best option for this particular patient.

Dr. Thomas Nolan, an OB/GYN professor at Louisiana State University Medical Center, testified as an expert on Dr. Jurgelsky's behalf. He opined that Dr. Jurgelsky's care was appropriate. He agreed that additional surgery was appropriate to make certain the bowel had not been perforated. Dr. Nolan believed that a

4

hysterectomy was appropriate based on discussions that Dr. Jurgelsky and Brenda had during the course of treatment. He also considered the fact that Brenda was already opened up which increased the risk for infection. She was also a high-risk patient due to her heavy weight, which could cause future menstrual problems in addition to the fact that the potential for endometrial cancer was slightly increased. It was his opinion that Dr. Jurgelsky was not guilty of malpractice.

For these reasons I would affirm the decision of the trial court.