898 So.2d 299 (2005)
Brenda R. THIBODEAUX and Lucien G. Thibodeaux
v.
Debbie M. JURGELSKY, M.D.
No. 2004-C-2004.
Supreme Court of Louisiana.
March 11, 2005.
Rehearing Denied April 29, 2005.
*300 Judice & Adley, Marc W. Judice, Lafayette, Harry Lane Tuten, III, Counsel for Applicant.
The LaBorde Law Firm, David C. LaBorde, Lafayette, The Patriquin Law Firm, Robert S. Patriquinn, Counsel for Respondent.
WEIMER, Justice.
In this action a patient and her husband sued a physician for damages allegedly caused by the physician's failure to obtain sufficient consent to surgery that ultimately resulted in the performance of a hysterectomy which, in turn, had an unfortunate result.
The defense prevailed in the trial court; the court of appeal reversed and rendered judgment for the plaintiffs, awarding damages.[1] For the reasons that follow, we find the court of appeal erred. We reverse and reinstate the judgment of the trial court in favor of the defendant physician.[2]

FACTS AND PROCEDURAL HISTORY
Pregnant for her second child, Brenda R. Thibodeaux first consulted Dr. Debbie M. Jurgelsky, an obstetrician/gynecologist (OB/GYN) who practices in Opelousas, Louisiana. Dr. Jurgelsky delivered the baby by cesarean section on August 4, 1991. Five years later, Mrs. Thibodeaux became pregnant for her third child and consulted Dr. Jurgelsky again. This child was also delivered by cesarean section on June 14, 1996.
*301 Mrs. Thibodeaux continued to see Dr. Jurgelsky, and, relevant to this case, consulted her on April 7, 1999, when it was determined she was again pregnant. On May 11, 1999, Mrs. Thibodeaux returned to the doctor's office for an ultrasound. This test showed the fetus was no longer alive. Dr. Jurgelsky consulted with her patient and plans were made for Mrs. Thibodeaux to be admitted to Opelousas General Hospital where Dr. Jurgelsky would perform a dilation and curettage (D & C) of the uterus to remove the products of conception. Mrs. Thibodeaux signed a written consent form on May 11, 1999.
On May 14, 1999, as planned, Mrs. Thibodeaux was admitted to Opelousas General Hospital and Dr. Jurgelsky began the D & C. When Dr. Jurgelsky attempted to remove the products of conception, utilizing scraping, gentle suction, and forceps, she encountered difficulties, which resulted in a uterine perforation. The doctor left the operating room and consulted the patient's husband, Lucien G. Thibodeaux. Mr. Thibodeaux told Dr. Jurgelsky to do whatever she thought best for his wife, and he signed a consent form authorizing her to perform a total abdominal hysterectomy.[3]
Shortly after being discharged from Opelousas General Hospital, Mrs. Thibodeaux began having complications, including incontinence and fever, which were treated conservatively by Dr. Jurgelsky. During an office visit and examination Dr. Jurgelsky discovered the incontinence was extraordinary, and she referred the patient to Dr. Frederick Rodosta, a urologist.
On June 9, 1990, Dr. Rodosta readmitted Mrs. Thibodeaux to Opelousas General Hospital and performed various diagnostic tests, which necessitated a surgical procedure but which were inconclusive. Dr. Rodosta closed the patient and allowed her to awaken in order to discuss various options with her. On June 11, 1999, with consent, an abdominal exploratory surgery was performed, and it revealed injury to the ureter, the connection between the kidney and the bladder. The surgeons found it necessary to perform a nephrectomy, removal of a kidney.
Following the surgery in June of 1999, Mrs. Thibodeaux's recovery was uneventful.
Mr. and Mrs. Thibodeaux filed suit against Dr. Jurgelsky, alleging the following wrongful acts which constituted breaches of the doctor's duty to her patient: failure to timely consider, act upon, and/or provide an effective working diagnosis to rule out the cause of physical symptoms highly indicative of post-operative complications following a total abdominal hysterectomy, which led to formation of a uterovesical vaginal fistula, retroperitoneal abscess, and eventual loss of a kidney; failure to take proper action in light of Mrs. Thibodeaux's complaints, instead relying on antibiotics, and advising a wait-and-see course of action; assuming Mrs. Thibodeaux wanted her uterus surgically removed, thereby assuming that she and her husband wanted no more children; and failure to attempt readily available alternatives to the total abdominal hysterectomy to preserve the uterus.
In addition to Mrs. Thibodeaux's claim for compensatory damages, Mr. Thibodeaux asserted entitlement to compensatory damages for loss of consortium and past and future mental, emotional, and psychological injuries associated with the loss of his wife's ability to bear any more *302 children.[4]
In her answer to the plaintiffs' petition, Dr. Jurgelsky alleges the facts stated in the petition were in general "an incomplete/inaccurate statement of fact." She also pleaded the affirmative defense of being a qualified health care provider and of having met the standard of care of LSA-R.S. 9:2794[5] and LSA-R.S. 40:1299.41 et seq., the Louisiana Medical Malpractice Act.
The matter was presented to a medical review panel. Two doctors on the panel, Dr. Joseph N. Dorta and Dr. Rebecca Accardo, found no breach in the appropriate standard of care for an OB/GYN. Dr. Felton Winfield, Jr., an OB/GYN, dissented from the majority of the panel and concluded Dr. Jurgelsky deviated from the proper standard of care because "[t]here were other options short of hysterectomy that should have been considered in this patient."
Trial on the merits was held March 10 through 12, 2003. At trial, one of the panel members, Dr. Dorta, testified for the defendant and, according to the district court, "specifically explained why the options suggested by Dr. Winfield [the dissenting panel member] were not appropriate and the action taken by Dr. Jurgelsky was reasonable under the circumstances." The trial court provided written reasons for judgment in favor of the defendant, holding that Dr. Jurgelsky did not deviate from the standard of care required by an OB/GYN health care provider. Further, concerning the issue of consent, the trial court concluded "Dr. Jurgelsky did in fact comply with the requirements of Louisiana's Consent to Medical Treatment Act  as a matter of fact the Court's opinion is that she went above and beyond the call of duty by getting the consent from the husband when she came out of surgery to discuss the situation."
After their motion for new trial was denied, the plaintiffs appealed.
A five-judge panel of the court of appeal, with a three-to-two vote, reversed and awarded damages to both Mrs. Thibodeaux and her husband. We will address the reasoning of the majority and the dissenting judges hereinafter.

DISCUSSION
The evolution of the legal doctrine of lack of consent and lack of informed consent guides our analysis of the plaintiffs' *303 claim and will assist us in resolving the issues in this case.
In the early 1900s, suits against physicians by patients who claimed they had never consented to treatment were based on the tort of battery. See Gary L. Boland,[6]The Doctrine of Lack of Consent and Lack of Informed Consent in Medical Procedure in Louisiana, 45 La.L.Rev. 1, 3 (1984). There was a distinction between the early, battery-principle cases and a medical malpractice action sounding in negligence. The writer explained:
In a battery cause of action, the [medical] procedure is performed without prior disclosure by the physician to the patient of the nature of "that treatment," and the patient may actually be unaware that a procedure is going to be performed. In a negligence cause of action, the nature of the particular treatment is explained to the patient, but possible complications, risks of treatment, and alternatives are not disclosed.
Id. at 4-5. Concerning the state of the law in the 1980s, the writer continues:
"The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence." When the battery theory of liability is used, the patient must prove that the doctor's "touching" caused an injury, but the patient does not have to prove a causal link between the doctor's failure to disclose information and the decision to undergo the procedure in question. [Citation omitted.]
Id. at 5.
Louisiana enacted a Uniform Consent Law, LSA-R.S. 40:1299.40, in 1975. The elements of the causes of action involving patient consent brought pursuant to the Uniform Consent Law were considered in three 1983 Louisiana Supreme Court decisions: Gunter v. Plauche, 439 So.2d 437 (La.1983) (lack of informed consent); Pizzalotto v. Wilson, 437 So.2d 859 (La.1983) (battery); LaCaze v. Collier, 434 So.2d 1039 (La.1983) (Dennis, J., concurring, 437 So.2d 869) (lack of informed consent). See Gary L. Boland, The Doctrine of Lack of Consent and Lack of Informed Consent in Medical Procedure in Louisiana, 45 La.L.Rev. 1 n. 1 and 24 n. 154 and n. 155.
The battery-principle cases and the negligence cases involving lack of informed consent continued to exist side by side until a significant amendment to LSA-R.S. 40:1299.40 was enacted in 1990. The 1990 amendment added Section E to the statute which provides in pertinent part:
In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery *304 may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent. [Emphasis supplied.]
LSA-R.S. 40:1299.40(E)(2)(a).[7]
Thus, the concepts of battery and negligent failure to obtain informed consent have been melded. The sole cause of action provided by the legislature for both allegations sounds in negligence, signifying a recognition of the absence of intentional conduct in both factual situations. See Lugenbuhl v. Dowling, 96-1575, p. 9 (La.10/10/97), 701 So.2d 447, 453 ("We therefore reject battery-based liability in lack of informed consent cases (which include no-consent cases) in favor of liability based on breach of the doctor's duty to provide the patient with material information concerning the medical procedure." (Emphasis supplied.))
With these developments of the law of informed consent in mind, we consider the applicable law in this case. Despite the 1990 amendment, LSA-R.S. 40:1299.40(A)(1) and (C), in existence since 1975 and 1976 respectively, still provide methods of obtaining and proving informed consent of the patient:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.

....
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases. [Emphasis supplied.]
After a brief statement of facts, the court of appeal considered: 1) whether *305 Mrs. Thibodeaux's written consent was adequate; 2) whether the consent Dr. Jurgelsky procured from Mr. Thibodeaux was valid; and 3) whether the plaintiffs proved that lack of informed consent caused the injuries suffered as a result of the hysterectomy. A majority of the five-judge panel determined all three of these issues in the plaintiffs' favor, requiring reversal of the trial court's findings. Although the majority cites a previous third circuit case, Capel v. Langford, 98-1517 (La.App. 3 Cir. 4/28/99), 734 So.2d 835, writs denied, 99-2080, 99-2086 (La.10/29/99), 749 So.2d 637, 638, which reversed a portion of a jury finding as being manifestly erroneous, the majority does not mention the manifest error standard of review.
In order to determine whether the court of appeal's reversal is supported by the record, we have thoroughly reviewed the evidence considered by the trial court, which we summarize hereafter. The district court considered the testimony of four expert witnesses, including the defendant, who were qualified in the specialty of OB/GYN health care, and the testimony of Mr. and Mrs. Thibodeaux.

Defendant's case:[8]
Dr. Jurgelsky testified extensively about her treatment of Mrs. Thibodeaux before and after the surgery which is the subject of this litigation. When Mrs. Thibodeaux consulted Dr. Jurgelsky in 1991, her pre-pregnancy weight was 190 pounds and she had borderline hypertension. Her second child was delivered by cesarean on August 4, 1991. Mrs. Thibodeaux returned in January of 1996, pregnant again and weighing 232 pounds. Her third child was delivered by cesarean on June 14, 1996. The medical records for that cesarean have the notation "tubal → no." Between pregnancies, at Mrs. Thibodeaux's request, the doctor prescribed birth control injections and pills.
Dr. Jurgelsky described Mrs. Thibodeaux's reaction to the news that she was pregnant when she returned in April 1999: "She was really upset ... crying. [U]pset mostly about being pregnant, and she didn't want to be pregnant. Her husband was supposed to have gotten a vasectomy, she was angry at him.... She didn't have insurance. It wasn't a good time. Basically they didn't want any more children. They had decided that."
Mrs. Thibodeaux returned on May 11, 1999, for an ultrasound and physical examination. The ultrasound was not normal, showing the fetus had died, which was noted as a "missed abortion." Dr. Jurgelsky consulted a pathologist about the measurements of the fetus shown on the ultrasound, which conflicted with the estimated date of conception. They agreed that the fetus had been dead for two to three weeks. It was important for the doctor to know how long the fetus had been dead because the longer the dead tissue stayed inside the uterus, the more toxic it would become, causing side effects such as infection or uncontrollable bleeding. The two- to three-week period, without any signs of bleeding, indicated to Dr. Jurgelsky that nature was not going to rid Mrs. Thibodeaux's body of the dead tissue.
The doctor and her patient agreed on scheduling a D & C for May 14, 1999, at the hospital. Mrs. Thibodeaux signed an "Informed Consent" form for the D & C, which was the standard consent form that Opelousas General Hospital used. The form provides in pertinent part:

*306 All medical or surgical treatment involves risks. Listed below are those risks associated with this procedure that we believe a reasonable person in your (the patient's) position would likely consider significant when deciding whether to have or forego the proposed therapy. Please ask your physician if you would like additional information regarding the nature or consequences of these risks, their likelihood of occurrence, or other associated risks that you might consider significant but may not be listed below:
HEMORRHAGE WITH POSSIBLE HYSTERECTOMY[;] PERFORATION OF THE UTERUS [;] STERILITY[;] INJURY TO BOWEL AND/OR BLADDER[;] INFECTION[;] FAILURE TO REMOVE ALL PRODUCTS OF CONCEPTION[;] ABDOMINAL INCISION AND OPERATION TO CORRECT INJURY[;] FORMATION OF SCAR TISSUE IN UTERINE CAVITY (AHSERMANN SYNDROME)[.]
Additionally, the form that Mrs. Thibodeaux signed and dated on both pages provides: "CONSENT: I hereby authorize and direct the designated authorized physician/group ... to administer or perform the medical treatment or surgical procedure described in item 1 of this Consent Form, including any additional procedures or services as they may deem necessary or reasonable." (Emphasis supplied.)
During her testimony, Dr. Jurgelsky described a normal D & C, but noted that in this case, she tried several methods of removing the products of conception  scraping, forceps, and gentle suction. While attempting the removal, Dr. Jurgelsky observed some fatty tissue, which is never in the uterus, indicating there had been a puncture. She believed the fatty tissue had come from the abdominal cavity. She was concerned the patient had suffered a bowel injury or was bleeding internally.
In the "Operative Report" Dr. Jurgelsky cites the difficulty in removing the products of conception, which was unusual because the fetus is generally not attached to the uterus. Her testimony was consistent with the report; she stated: "[I]n the twenty-one, twenty-two years I've been doing D & C's this is absolutely the worse [sic] case. I was able to get out very little of the tissue.... This was almost like everything had been super glued to the lining.... There's just no way to have gotten it out vaginally."
Dr. Jurgelsky's concern was that if Mrs. Thibodeaux were to have gone home with some of the necrotic (dead) tissue still in her uterus, she risked disseminated intra vascular coagulation, bleeding that can kill the patient because there is no way to stop such bleeding. Recalling the situation while on the witness stand, Dr. Jurgelsky did not think she could have gotten all the tissue off the uterus after making the abdominal opening, because the tissue "was stuck so badly."
Prior to performing the hysterectomy, Dr. Jurgelsky had a discussion with Mr. Thibodeaux because the D & C was "out of the ordinary.... I wanted to let him know of the options that could be done, and ... what was going on that was different from what would regularly be expected of a D & C." At the time she left the operating room, Dr. Jurgelsky thought there was an emergency because the pregnancy tissue was open to infection, and she did not know if there was an injury to the colon; in her mind she thought it an emergency that could not justify awakening the patient to get her consent.
At trial, Dr. Jurgelsky narrated what she believed the patient's condition to be and what she informed Mr. Thibodeaux: in sum, that the D & C had not gone well and *307 she could not accomplish what had been intended. She told him she could continue to try to scrape, but she did not think that was in his wife's best interest. When asked if the hysterectomy was performed because an emergency existed, Dr. Jurgelsky answered the hysterectomy was an emergency because of what had occurred in the operating room. She also testified the D & C was not an emergency when Mrs. Thibodeaux was in the office on May 11. Dr. Jurgelsky further stated the hysterectomy was not the result of a life-threatening emergency (an event that would not have allowed her to leave the operating room to talk to Mr. Thibodeaux), but it was an "emergent."[9]
Mr. Thibodeaux signed the consent form before Dr. Jurgelsky returned to the operating room. The consent was to a total abdominal hysterectomy to provide treatment for a hole in the uterus and internal bleeding. The listed risks were:
INFECTION IN SURGICAL AREA REQUIRING ANTIBIOTIC THERAPY[;] UNCONTROLLABLE LEAKAGE OF URINE[;] INJURY TO BLADDER[;] FAILURE OF WOUND TO HEAL [;] INJURY TO THE URETER[;] INJURY TO THE BOWEL AND/OR INTESTINAL OBSTRUCTION [;] DAMAGE TO MAJOR BLOOD VESSEL, HEMORRHAGE, NEED FOR TRANSFUSION OF BLOOD PRODUCTS[;] FORMATION OF FISTULA (LEAKAGE OF URINE OR BOWEL CONTENTS THROUGH VAGINA)[;] PAINFUL INTERCOURSE[;] OVARIAN FAILURE REQUIRING HORMONE ADMINISTRATION[;] INFECTION[;] UNSATISFACTORY SEXUAL FUNCTION[;] BLEEDING [;] INJURY TO THE TUBE (URETER) BETWEEN THE KIDNEY AND BLADDER[;] PERMANENT AND DISFIGURING SCARRING[;] INFECTION[;] PULMONARY EMBOLISM (BLOOD CLOT FROM PELVIS OR LEGS THAT MOVES TO LUNGS).
Dr. Jurgelsky denied that her repair of the punctured uterus and stoppage of the bleeding eliminated any emergency that would justify the hysterectomy. She stated it was "absolutely not" the best thing to complete the D & C through the abdominal incision (a hysterotomy[10]), let the patient wake up, and get her consent. The consequences of leaving some necrotic tissue in the uterus could be life threatening. Monitoring the patient while allowing nature to expel whatever necrotic tissue was left in the uterus was not appropriate because the risks were too great. In Dr. Jurgelsky's judgment the risks were: 1) probable death; 2) serious infection; and 3) hemorrhage before the patient could make it to the emergency room.
Concerning Mrs. Thibodeaux's reaction to Dr. Rodesta's awakening her after the first surgery he performed in order to discuss the removal of her kidney, Dr. Jurgelsky stated: "She was real mad too. She wished he would have kept her asleep like I did and just finished with it." Dr. Jurgelsky explained to Mrs. Thibodeaux that one reason Dr. Rodosta chose not to go ahead with removal of the kidney was to allow time for antibiotics to "cool an infection down" before proceeding further.
On discharge from the hospital after the kidney removal, according to Dr. Jurgelsky's records, Mrs. Thibodeaux was *308 happy with the hysterectomy, as she was planning to have a tubal ligation anyway. During several discussions prior to the hysterectomy, Mrs. Thibodeaux told Dr. Jurgelsky how terrible she thought her periods were. During Dr. Jurgelsky's visits to Mrs. Thibodeaux in the hospital after the hysterectomy, Mrs. Thibodeaux expressed no anger or disappointment about the hysterectomy and just indicated she was glad she would have no more periods. On July 7, 1999, Mrs. Thibodeaux took a new patient to Dr. Jurgelsky, her minor daughter. She wanted the daughter on birth control pills early in life so she could avoid having heavy, troublesome periods like Mrs. Thibodeaux's.
Finally, Dr. Jurgelsky testified that the pathology report, available a few days post-surgery, showed a submucosal fibroid and confirmed that she made the right decision to perform the hysterectomy. A submucosal fibroid is one that has grown through and through the uterus. It may have been the cause of the miscarriage. If one has a hysterectomy done for fibroids, it generally is for submucosal fibroids, like the one Mrs. Thibodeaux had.
One of the defense expert witnesses, Dr. Dorta, an OB/GYN who served on the medical review panel, verified that he voted with the majority, concluding: "The hysterectomy was a reasonable option for removing the main products of conception that were densely adhered to the uterine wall." Dr. Dorta explained that a D & C is done for a loss of a pregnancy, but there is always concern for retained products. Reviewing the instant case, the majority of the panel felt hysterectomy was a standard option to follow in this situation. When queried about the suggestion that Dr. Jurgelsky should have repaired the tear in the uterus and then let nature expel the products of conception, Dr. Dorta stated it would be an option, but he would never do it. There were too many potential problems: infection, bleeding, disseminated intra vascular coagulation, postoperative complications with peritonitis, sepsis, and life-threatening fevers. He did not think too many physicians would have awakened the patient to discuss the options and get her permission, but talking to the husband was beneficial.
Dr. Dorta pointed out there is a different environment reviewing a case record and being in the operating room with the patient in your hands. He did not think the husband's consent was required in this case with the doctor knowing the patient well.
This witness verified what Dr. Jurgelsky had stated: the longer products of conception are not viable, the greater the probability of having very serious complications of disseminated intra vascular coagulation. The products of conception become necrotic, they start releasing toxins, and the immune system starts getting involved; it can turn into a life-threatening situation.
Concerning the fibroid Mrs. Thibodeaux had as reported in the pathology report, Dr. Dorta said fibroids are one of the most common reasons for hysterectomy in the United States.
When questioned by the court about the theory of waking the patient to get her permission, Dr. Dorta stated that would require sewing her up and waiting two days before re-intervention. If the option is taken not to do the hysterectomy because she was not bleeding when you opened her up, that does not mean she will not bleed later. It is more probable than not that the patient will bleed afterwards. Dr. Dorta stated clearly that once the patient is opened up, the surgeon is "almost committed" to proceeding with the hysterectomy.
*309 The witness was questioned about the husband's choice between a hysterotomy and a hysterectomy. He responded that because the husband was not the patient, his consent was inconsequential. Dr. Dorta would have gone on with the hysterectomy based on the clinical picture of this patient at the time Dr. Jurgelsky did the surgery. When a surgeon does a cesarean, the patient is opened to remove the baby, but the baby is generally not stuck to the uterus. If the patient had been 22 years old with no children, he probably would have considered the hysterotomy, but the considerations are different when evaluating the clinical picture of this 37-year-old mother of three.
Another expert witness for the defense was Dr. Thomas E. Nolan, who is a professor at the Louisiana State University OB/GYN school in New Orleans. Dr. Nolan thought the care given Mrs. Thibodeaux in 1999 was appropriate. He summarized the reasons for performing the hysterectomy as follows:
[T]he patient has been having problems of bleeding. She was thirty-seven.... She had already had three other children. She had two previous surgeries, caesarean sections. Her husband and her [sic] had discussed sterilization. The physician had an unexpected complication of the particular surgery, went and spoke to the husband, told him what she thought the right way to proceed was, which I think was appropriate, and then went back and did the appropriate or one of the surgical options.... [S]he and her husband had come to some degree of discussion about sterilization, and this was an appropriate way to sterilize. And also the patient had bleeding problems, and on the pathology report had a fibroid tumor that would be consistent with the increase in bleeding that she'd been having prior to her pregnancy.
Dr. Nolan concluded Dr. Jurgelsky could have oversewn the uterus, continued to scrape, and gotten into a "whole lot more problems."
In treating a patient, according to Dr. Nolan, the physician must take everything into consideration, such as age, previous surgeries, and the patient's body habitus (the physical and constitutional characteristics of an individual, especially the tendency to develop a certain disease). A medical decision is "not a cookbook."
Additionally, Dr. Nolan explained that the word "emergency" has many different meanings, and the consent form signed by the patient says additional surgeries may be required at the time of perforation. Dr. Nolan's opinion was that Dr. Jurgelsky had authority to do the hysterectomy without consulting the husband. The abscess and the removal of the kidney were "very unfortunate" and rare.
On cross examination, Dr. Nolan testified that treating a patient for ten years is a rarity in America, and the physician can reach a certain comfort level with the patient and not have to chart as much. One justification for performing the hysterectomy was that the surgeon had already opened the abdomen on this "high risk" patient. Dr. Nolan considered Mrs. Thibodeaux high risk because of her weight,[11] other menstrual problems, and foreseeable problems with ovulation in the future. He stated that it becomes the surgeon's judgment at the operating table that day, depending on all facts and circumstances of the particular patient.
This witness stated Dr. Jurgelsky had the "option" of going out and getting the consent of the husband, as she did, instead *310 of doing the D & C after opening the abdomen and then getting Mrs. Thibodeaux's consent to a later hysterectomy. When questioned by the trial court concerning the consent form signed by Mrs. Thibodeaux, Dr. Nolan stated there was no need to get the husband's consent, but it is best to communicate with the family when something untoward happens.
Dr. Nolan concluded Dr. Jurgelsky met the standard of care in going forward with the hysterectomy.

Plaintiffs' case:
The plaintiffs presented the deposition testimony of one expert witness, Dr. Felton L. Winfield, the OB/GYN who served on the medical review panel and dissented from the majority's opinion, being of the opinion that Dr. Jurgelsky deviated from the standard of care because "other options short of hysterectomy ... should have been considered" for Mrs. Thibodeaux. For example, prior to the exploratory laparotomy, the surgeon could have done an "ultrasound guided D & C."
When asked by counsel for the plaintiffs what he would have done when perforation of the uterus was discovered, Dr. Winfield replied he would have used laparoscope to made sure the patient was hemostatic (with the bleeding arrested), repaired the perforation of the uterus, and completed the D & C. The witness suggested that after the D & C the patient could be observed for 24 hours in the hospital. He definitively stated that even if he thought he had not removed the products of conception in the D & C, which is a blind procedure, he would not do a hysterectomy. His opinion was that after the surgeon removes what tissue can be removed, the bleeding afterwards will pass the remaining tissue. In this case, without doing a hysterectomy, Dr. Winfield would have awakened the patient, observed her in the hospital, and if she needed more care later, such as a hysterectomy, she would be involved in the decision-making process.
Dr. Winfield's review of the record in this case led him to the conclusion that Dr. Jurgelsky was not faced with an emergency at the time of the D & C. He later qualified this statement by saying if Dr. Jurgelsky had the time to leave the operating room to talk to Mr. Thibodeaux, it was not a "life-threatening emergency." However, the witness would not say a hysterectomy was inappropriate if Mrs. Thibodeaux was not in a life-threatening situation, because a hysterectomy after a D & C happens sometimes and that is why it is on the consent form. When he "consents" a patient for a D & C, he advises her there is a risk of the need for a hysterectomy.
Dr. Winfield testified that if the patient had a "lateral tear in the posterior aspect of the uterus" there could have been injury to the ureter. However, it is more probable than not that the patient would not have suffered the ureter injury if the hysterectomy had not been performed. Nevertheless, the result of a perforation of the uterus, even a mere two-centimeter tear, is that the patient cannot go into labor thereafter; a cesarean section is required for the delivery. Perforation of the uterus is common and occurs in the absence of negligence; perforations happen all the time, for example in abortions, but physicians do not do hysterectomies all the time. Dr. Winfield was queried about Dr. Nolan's opinion, in his deposition testimony, that once there is a perforated uterus and the surgeon has instrumented a patient, the surgeon is obligated to either remove all products of conception or remove the uterus, or else the surgeon falls below the standard of care. Dr. Winfield did not agree, saying he would do a hysterotomy, although he has never done a hysterotomy to remove the products of conception at 13 to 18 weeks of pregnancy.
*311 Agreeing the fetus had been dead for a long period of time, Dr. Winfield stated that was why it was necrotic and adhered to the uterus. He noted the pathology report said "superficially adhered" to the myometrium, which is the second layer of the uterus. Admitting that all products of conception cannot always be removed by a D & C, Dr. Winfield would only admit that a hysterectomy is a "final option" within the standard of care. His conclusion was: "Based upon the things I read in this case ... I don't think hysterectomy was appropriate at this time."
The other two witnesses were the plaintiffs themselves. Mr. Thibodeaux's testimony basically verified his conversation with Dr. Jurgelsky and his statement to her that she should do what she thought best. Dr. Jurgelsky told Mr. Thibodeaux that his wife had said she wanted no more children after the 1999 pregnancy. He admitted that before the 1999 pregnancy his wife had talked about his having a vasectomy, but it "went in one ear and out the other" because he was not going to undergo that procedure. He acknowledged April of 1999 was a "bad time" for a pregnancy because he had just changed jobs.
Mr. Thibodeaux testified the couple have been married for 22 years; they have two girls and one boy, and he would like to have another boy. Although his relationship with his wife and her activities have not changed since the kidney surgery, he worries about his wife having only one kidney, which may fail in the future.
Mrs. Thibodeaux testified that on her second visit to Dr. Jurgelsky in 1999, they talked about scheduling the cesarean and talked about a tubal ligation after the baby was born. She was getting prices for the birth and for the tubal ligation because she was paying cash. Dr. Jurgelsky explained to her that her periods would get even worse after the tubal ligation.
The next visit was the scheduled ultrasound. When the technician could not see any movement, she called Dr. Jurgelsky who eventually said the fetus had perished. Later, Mrs. Thibodeaux and the doctor discussed and scheduled the D & C. Three days later she had the surgery, and she remembers Dr. Jurgelsky waking her and telling her the uterus had torn and she had to do a hysterectomy. Mrs. Thibodeaux denied telling Dr. Jurgelsky that she did not want any more children prior to April of 1999, but she admitted telling the doctor that she had heavy periods. She is not taking any hormones now, because her ovaries were not removed during the hysterectomy.
After recounting details of her condition following the hysterectomy and her problems with incontinence and fever, Mrs. Thibodeaux testified about her discussion with Dr. Rodosta regarding options for the kidney surgery.
When the defense rested its case, Mrs. Thibodeaux was called to the stand again on rebuttal. She explained that she did not complain about the hysterectomy, even after the kidney surgery, because she thought the hysterectomy was absolutely necessary from what Dr. Jurgelsky and her husband had told her.

Legal errors:
We begin our discussion of the court of appeal's decision with an explanation of the legal error the majority fell into in determining the validity of Mr. Thibodeaux's consent to the hysterectomy. The majority found the husband was not authorized to consent to the hysterectomy by this state's statutory provisions. Louisiana Revised Statutes 40:1299.53 provides that a patient's spouse not judicially separated "is authorized and empowered to consent, either orally or otherwise, to any surgical *312 or medical treatment or procedures including autopsy not prohibited by law which may be suggested, recommended, prescribed or directed by a duly licensed physician."[12] However, LSA-R.S. 40:1299.51 provides that the Louisiana Medical Consent Law, which includes LSA-R.S. 40:1299.53, "shall not apply in any manner whatsoever to the subjects of abortion and sterilization, which subjects shall continue to be governed by existing law" independently of the terms and provisions of the Louisiana Medical Consent Law.
The majority stated the "existing law" concerning sterilization is "sparse," but that a review of all pertinent legislation led the court to believe the legislature intended to guarantee an individual patient, alone, the right to make the decision to submit to medical treatment that would effectively end his or her ability to procreate "unless an emergency prevents the patient from having that opportunity." Thibodeaux, 03-1298 at 4, 879 So.2d at 914. The majority cited Beck v. Lovell, 361 So.2d 245, 250 (La.App. 1 Cir.), writ denied, 362 So.2d 802 (1978), as authority for the proposition that "absent an emergency, the relationship of husband and wife does not confer authority for one spouse to grant permission for surgery on another." (Emphasis supplied.)
The majority's reliance on Beck is misplaced because it is based on the court's conclusion that "the issue of consent is still governed by the law enunciated in Beck" in 1978. Thibodeaux, 03-1298 at 5, 879 So.2d at 914. The court acknowledges that LSA-R.S. 40:1299.53 now governs a third party's authority to consent to surgeries and medical treatments, but concludes that statute is inapplicable to a procedure "involving" sterilization. Id. The majority recognizes that Dr. Jurgelsky's purpose in performing the operation was not solely to render Mrs. Thibodeaux sterile. However, the court states the doctor's purpose in performing the operation is relevant only if she was faced with an emergency situation.
As the dissent in the instant case points out, LSA-R.S. 40:1299.53(A) does not require that an emergency be present for a spouse to consent, only that the surgery be "suggested, recommended, prescribed, or directed by a duly licensed physician." Thibodeaux, dissent, 03-1298 at 3, 879 So.2d at 918. Further, LSA-R.S. 40:1299.40(A) provides that the consent form be signed "by a person who has legal authority to consent" on behalf of a patient "if the patient for any reason lacks legal capacity to consent." (Emphasis supplied.) This statutory provision is broad enough to authorize consent by a husband if his wife is under anesthesia.
Pretermitting the issue of whether there was an emergency situation, we find the doctor's purpose quite relevant in determining whether the exclusion in LSA-R.S. 40:1299.51 applies in this factual situation. Dr. Jurgelsky informed Mr. Thibodeaux that she and his wife had discussed the patient's problematic periods, her wishes not to have more children, and her knowledge that he did not want to have a vasectomy. However, the record is clear that these facts were not the medical purpose of the hysterectomy. Dr. Jurgelsky testified extensively regarding her decision that a hysterectomy was warranted, not for the purpose of sterilization, but due *313 to the potential for hemorrhage and serious future complications. Dr. Dorta testified hysterectomy was preferable to a hysterotomy in order to avoid the risks of infection, bleeding, disseminated intra vascular coagulation, postoperative complications with peritonitis, sepsis, and life-threatening fevers. Significantly, when cross-examined by plaintiffs' counsel about why she did not schedule a hysterectomy instead of a D & C at the time the demise of the fetus was discovered, knowing Mrs. Thibodeaux's wishes not to have more children and her intent to have a tubal ligation at the time of what would have been her fourth delivery, Dr. Jurgelsky stated, "You just don't do a hysterectomy on somebody when something milder can be done that's safe.... You don't want to ever have to do a hysterectomy on somebody that is pregnant."
Mr. Thibodeaux told the doctor to do what she thought was best (apparently without expressing his desire for more children) and signed a consent form for a hysterectomy which listed injury to the ureter and leakage of urine through the vagina as possible risks.
We agree with the two dissenting judges that the purpose of the hysterectomy in this case was not as a sterilization procedure. We conclude the majority committed legal error in finding LSA-R.S. 40:1299.51 vitiated Mr. Thibodeaux's otherwise valid consent to the performance of a hysterectomy and the enumerated risks.
The second legal error occurred in the court of appeal's determination that Mrs. Thibodeaux's signature on the consent form did not trigger a presumption of valid consent pursuant to LSA-R.S. 40:1229.40(A)(1).
The majority distinguished between "risk" and "choice," the latter being intentional and pro-active. The court stated a physician may not make a choice absent informed consent unless faced with an emergency.[13] Mrs. Thibodeaux signed a consent form for the D & C procedure which warned her of certain risks, including "hemorrhage with possible hysterectomy," "perforation of the uterus," and "sterility." Perforation of the uterus was a risk that materialized during the D & C procedure, but hemorrhage did not although, when she spoke to Mr. Thibodeaux, Dr. Jurgelsky was concerned that his wife was hemorrhaging. However, after the doctor opened her patient's abdomen to repair the uterus, the doctor saw there was no hemorrhaging. The majority found a hysterectomy was "not warranted due to that circumstance." Thibodeaux, 03-1298 at 3, 879 So.2d at 913. Further, while the consent form informed Mrs. Thibodeaux that sterility was a possible risk of the D & C procedure, according to the majority sterility did not result from the D & C, but from the "unauthorized" hysterectomy. "In other words, it was a choice, among other available options, which Dr. Jurgelsky made ... absent an emergency." Id.
The language of the majority opinion distinguishing between "risk" and "choice" and stating that the latter is "intentional and pro-active" is a thinly disguised reversion to the days of the battery principle in medical malpractice cases  a principle rejected by the legislature and the courts. The Medical Malpractice Act provides that "malpractice" is "any unintentional tort or any breach of contract *314 based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient." (Emphasis supplied.) LSA-R.S. 40:1299.41(A)(8). As previously noted, LSA-R.S. 40:1229.40(E)(2)(a) provides that "the only theory on which recovery may be obtained is that of negligence" in a lack of informed consent case. In Lugenbuhl, 96-1575 at 9, 701 So.2d at 453, this court rejected battery-based liability, even in cases where "no consent" is alleged, in favor of liability based on the doctor's duty to provide the patient with material information concerning the medical procedure.
Thus, the majority's opinion that the hysterectomy was an intentional act by Dr. Jurgelsky absent her patient's consent ignores clear statutory language and controlling jurisprudence, which constitutes legal error on the part of the court of appeal.
Further, the majority's decision that the hysterectomy was not a risk led the court of appeal to omit an essential element of the analytical formula in a lack of consent case: the determination of materiality of the disclosure the plaintiffs urge the physician failed to make.
This court has explained:
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.
Hondroulis v. Schuhmacher, on reh'g, 553 So.2d 398, 412 (La.1989).
To determine whether the non-disclosure was a material risk we must look to the testimony of the expert witnesses. Dr. Dorta stated that the husband's consent was "inconsequential." Dr. Nolan testified that Dr. Jurgelsky had authority to perform the hysterectomy without consulting the husband, thus indicating that in this factual situation a more specific listing of hysterectomy was unnecessary and not material. Dr. Jurgelsky testified the adhesion of the necrotic tissue to the uterus was the worst she had ever encountered, obviously a rare occurrence. However, the plaintiffs' expert, Dr. Winfield, testified he advises patients who are going to have a D & C that there is a risk of the need for a hysterectomy. He stated further that performance of a hysterectomy is within the applicable standard of care although it is the final option that should be considered. The doctors who testified for the defense merely implied that hysterectomy was not a material risk in this case. However, since Dr. Winfield's testimony directly addressed the issue of disclosure, we can conclude that the first prong of the materiality test, i.e., the existence and nature of the risk and likelihood of occurrence, was proved by plaintiffs.
Next, considering the risks that were disclosed on the consent form that Mrs. Thibodeaux signed  hemorrhage with possible hysterectomy, perforation of the uterus, sterility, and abdominal incision/operation to correct injury  along with the doctors' testimony, we can infer that listing hysterectomy caused by something other than hemorrhage was not material to a reasonable person in the patient's position. In other words, Mrs. Thibodeaux accepted the risks of: losing her *315 uterus, although as a result of a specific happening; sterility; and abdominal incision. To say that a reasonable person, or Mrs. Thibodeaux herself, would have considered a more specific listing of hysterectomy[14] important in making her decision of whether to have or not to have the D & C is a strained interpretation of the evidence. We conclude plaintiffs failed to prove the second prong of materiality.
Thus, the majority's conclusion that neither Mrs. Thibodeaux's signature nor that of her husband on the respective consent forms created a presumption of valid consent for the hysterectomy was flawed with legal error.
After deciding that the presumptions of validity were not available to the defense, the majority then proceeded to consider the other elements of a lack of informed consent action: 1) causal relationship, and 2) the reasonable patient test. The court noted causal relationship was "easily met," because the hysterectomy caused the patient to be sterile and ultimately to endure the nephrectomy. Thibodeaux, 03-1298 at 6, 879 So.2d at 915.
The next legal error occurred in the court of appeal's misapplication of the reasonable patient test  whether a reasonable patient in the plaintiff's position would have consented to the "procedure" had the material information and risks been disclosed. The majority decided "a reasonable person would have chosen the least intrusive means of all available alternatives" to the hysterectomy. Id. This statement by the appellate court misstates the proper test. The test is:
Causation is established only if adequate disclosure reasonably would be expected to have caused a reasonable person to decline treatment because of the disclosure of the risk or danger that resulted in the injury. Although the patient has the absolute right, for whatever reason, to prevent unauthorized intrusions and treatments, he or she can only recover damages for those intrusions in which consent would have been reasonably withheld if the patient had been adequately informed. [Citations omitted; emphasis supplied.]
Lugenbuhl, 96-1575 at 12, 701 So.2d at 454.
After our review of the evidence, we are convinced that had the court of appeal correctly stated the causation test, the only logical conclusion was that a reasonable person, and even Mrs. Thibodeaux herself, would not have withheld her consent to the D & C in light of the patient's medical condition and personal history in this particular case. There is no indication in the record by any of the experts that the D & C was not urgently necessary.
The final, but not the least significant, legal error was the court of appeal's departure from the manifest error standard of review. The opinion makes no mention of any standard of review. The majority concluded Mrs. Thibodeaux proved the elements of her lack of informed consent claim and Dr. Jurgelsky was liable for all damages associated with the unauthorized hysterectomy, including the nephrectomy. Thibodeaux, 03-1298 at 6, 879 So.2d at 915.[15] This conclusion is *316 the antithesis of the trial court's factual findings that Dr. Jurgelsky complied with the requirements of LSA-R.S. 40:1229.40 and "went above and beyond the call of duty" by getting Mr. Thibodeaux's consent to the hysterectomy.
After reviewing the record, we conclude the court of appeal improperly substituted its own factual findings for that of the district court, thereby misapplying the manifest error standard of review. The court of appeal's failure to abide by the manifest error standard of review was contrary to the established jurisprudence of the third circuit and this court. In Capel, 98-1517 at 6-9, 734 So.2d at 840-841, the third circuit correctly performed a manifest error analysis of the record in a lack of informed consent case. In Lugenbuhl, 96-1575 at 11, 701 So.2d at 453, another informed consent case, we stated: "An appellate court, in reviewing a jury's determination that a doctor failed to obtain the patient's informed consent, should focus on the duty of the doctor to provide material information to the patient under the circumstances of the particular case." Noting that the jury apparently accepted the plaintiff's testimony, corroborated by that of his wife and daughter, and not the conflicting testimony of the doctor, we stated the evidence must be viewed in the light most favorable to the party who prevailed before the trier-of-fact. Likewise, in Martin v. East Jefferson General Hospital, 582 So.2d 1272, 1276-1277 (La.1991), we stated that deciding whether the plaintiff established by a preponderance of the evidence that the doctor's actions fell below the ordinary standard of care expected of physicians in his medical specialty and whether a causal relationship existed between the alleged breach of that standard and the injury sustained are determinations of fact which should not be reversed on appeal absent manifest error. Further,
"[I]f the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." We have instructed the appellate courts that where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.

....
[E]xpert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions.... The determination of an expert's credibility is also a factual question subject to the manifestly erroneous/clearly wrong standard of review. [Citations omitted; emphasis supplied.]
Martin, 582 So.2d at 1277.
In the instant case, the trial court found for a fact that when Dr. Jurgelsky began the D & C in an effort to remove the deceased fetus, she encountered difficulty which resulted in a uterine perforation. The trial court evaluated the conflicting evidence as follows:
Plaintiff's contention is to the effect that Dr. Jurgelsky's treatment of Mrs. Thibodeaux was below the standard of care which one would have expected to receive from her specialist in OB/GYN. Plaintiff's position[ ] is based pretty much entirely upon the testimony of Dr. Felton Winfield, Jr. Dr. Winfield is an OB/GYN and served as one of the members of the Medical Review Panel. While the Medical Review Panel found no fault on the part of Dr. Jurgelsky, Dr. Winfield did not vote with the majority *317 and in effect dissented indicating that Dr. Jurgelsky did deviate from the standard of care because "there were other options short of hysterectomy that should have been considered in this patient."
In response to that position it is the defendants' [sic] contention that she did consider other possible options but rejected them concluding that hysterectomy "was the answer." The defendants' [sic] position is supported by the Medical Review Panel, and upon the trial of the issue the defendant's expert witnesses addressed the options alluded to by Dr. Winfield. At the time of the trial the testimony of the defendants' [sic] experts specifically explained why the options suggested by Dr. Winfield were not appropriate and the action taken by Dr. Jurgelsky was reasonable under the circumstances.
....
[T]he Court is of the opinion that Dr. Jurgelsky did in fact comply with the requirements of Louisiana's Consent to Medical Treatment Act  as a matter of fact the Court's opinion is that she went above and beyond the call of duty by getting the consent from the husband when she came out of surgery to discuss the situation. Accordingly, [lack of informed consent] will not form the basis for recovery herein.
Our review of the record convinces us the testimony at trial overwhelmingly supports the trial court's findings and accentuates the legal flaws in the court of appeal's majority opinion. Reversal of the trial court's judgment in defendant's favor was erroneous, if for no other reason than failure to adhere to the manifest error standard of review.

CONCLUSION
In summary, we find that the majority of the court of appeal panel fell into error in finding: 1) Mr. Thibodeaux's consent was barred by statutory provisions; 2) Mrs. Thibodeaux's consent to the D & C was insufficient authorization for Dr. Jurgelsky to proceed with the hysterectomy; 3) hysterectomy absent hemorrhage was not warranted under the circumstances; and 4) a reasonable person in Mrs. Thibodeaux's position would not have consented. All of these findings resulted in a failure of the reviewing court to accord the trial court's factual findings the great deference required by the manifest error standard of review.
Accordingly, we reverse the judgment of the appellate court and reinstate the judgment of the district court.
REVERSED AND RENDERED.
JOHNSON, J., dissents.
KIMBALL, J., concurs and assigns reasons.
KIMBALL, J. concurs.
I concur in the majority's decision to reverse the judgment of the court of appeal and to reinstate the judgment of the trial court in favor of the physician. As stated by the majority, the initial inquiry in a lack of informed consent case involves the doctor's duty to provide material information to the patient regarding the medical procedure to be undergone. See Lugenbuhl v. Dowling, 96-1575 (La.10/10/97), 701 So.2d 447. Once plaintiff proves that the physician failed to disclose all material information, only then must she prove that there was a causal relationship between the doctor's failure and the damages claimed by first proving the breach was a cause-in-fact of the damages and by then proving that a reasonable patient in her position would not have consented to the *318 procedure had the material information and risks been disclosed. Id.
I agree with the majority's conclusion that the first prong of the materiality determination, that the need for a hysterectomy is a risk associated with a D & C, was proved by plaintiffs. However, although a D & C involves the risk of a hysterectomy, I believe plaintiffs failed to show that a more general listing of hysterectomy in the informed consent form signed by Mrs. Thibodeaux in this case would have been significant to a reasonable person in her position in light of the fact that the form included the risks of hemorrhage with possible hysterectomy, sterility, injury to bowel and/or bladder, and abdominal incision and operation to correct injury. Thus, in my view, the majority correctly determined that plaintiffs failed to prove the second prong of materiality. Once this conclusion was reached, the remainder of the majority's discussion of the other elements of a lack of informed consent action is dicta and need not have been undertaken.
NOTES
[1] Thibodeaux v. Jurgelsky, 03-1298 (La.App. 3 Cir. 7/14/04), 879 So.2d 909.
[2] The defendant's writ application to this court was granted. Thibodeaux v. Jurgelsky, 04-2004 (La.11/15/04), 887 So.2d 462. The plaintiffs' writ application, 04-C-2126, was held in abeyance.
[3] "Hysterectomy" is defined as "[s]urgical removal of part or all of the uterus." THE AMERICAN HERITAGE(R) STEDMAN'S MEDICAL DICTIONARY (2002).
[4] The record reveals Mrs. Thibodeaux's ovaries were not removed. The plaintiffs' expert witness, Dr. Felton L. Winfield, stated if she still has ovaries, she can still have children, but she cannot bear them herself.
[5] Louisiana Revised Statutes 9:2794 provides, in pertinent part:

A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
[6] In 1984 the author was Director of the Center of Continuing Professional Development, Paul M. Hebert Law Center, Baton Rouge, Louisiana.
[7] The 1990 amendment also created in Section E the Louisiana Medical Disclosure Panel and charged it with determining which risks and hazards related to medical care and surgical procedures must be disclosed by a physician to a patient and establishing the general form and substance of such disclosure. LSA-R.S. 40:1299.40(E)(3)(a). There is testimony in this record that the consent forms signed by Mr. and Mrs. Thibodeaux were forms provided by this panel to the hospitals and physicians and contained the risks associated with D & C and with hysterectomy.
[8] We begin with the defendant's case instead of the plaintiffs' case because Dr. Jurgelsky, as the treating physician, narrated the facts of the patient's history and treatment which culminated in the surgery that is the subject of this litigation.
[9] "Emergent" is defined as "calling for prompt or urgent action." MERRIAM-WEBSTER MEDICAL DICTIONARY (2002).
[10] "Hysterotomy" is defined as "[i]ncision of the uterus." THE AMERICAN HERITAGE(R) STEDMAN'S MEDICAL DICTIONARY (2002).
[11] On the date of the D & C, Mrs. Thibodeaux was 5'5" tall and weighed 250 pounds.
[12] The statute provides that the spouse is fourth in the priority list for persons who are authorized to give consent; the first three are: "(1) Any adult, for himself. (2) The judicially appointed tutor or curator of the patient, if one has been appointed. (3) An agent acting pursuant to a valid mandate, specifically authorizing the agent to make health care decisions."
[13] "The doctor is not required to disclose material risks or information when a genuine emergency arises because the patient is unconscious or otherwise incapable of consenting, and harm from a failure to treat is imminent and outweighs harm threatened by the proposed treatment." Hondroulis v. Schuhmacher, on reh'g, 553 So.2d at 413.
[14] We note that if the form had listed "hemorrhage" and "hysterectomy" separately, allegations of lack of informed consent would have been precluded.
[15] The court considered some of the testimony of the parties. For example, in determining causation the court noted Dr. Jurgelsky testified she considered the patient's age, 37, along with the fact that she and the patient had previously discussed her desire for her husband to have a vasectomy; the Thibodeauxs both testified they wanted more children. However, the court does not articulate a manifest error analysis of the record.