PASCHA MADISON AND JAMES W. SCOTT, JR. INDIVIDUALLY AND ON BEHALF OF THEIR MINOR SON, JAMES W. SCOTT, III
v.
GERALD E. STACK, M.D. AND LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY.
No. 2007 CA 1719.
Court of Appeals of Louisiana, First Circuit.
March 26, 2008.
NOT DESIGNATED FOR PUBLICATION.
JOSEPH A. KOTT, JAMES C. KLICK, Counsel for Plaintiffs/Appellants, Pascha Madison, et al.
VANCE A. GIBBS, JASON R. CASHIO, Counsel for Defendants/Appellees, Gerald E. Stack, M.D., et al.
Before: WHIPPLE, GUIDRY, and HUGHES, JJ.
WHIPPLE, J.
In this medical malpractice case, plaintiffs, Pascha Madison and James W. Scott, Jr., individually and on behalf of their minor son, James W. Scott, III ("J.W."), ("collectively referred to as "plaintiffs" herein) appeal from a judgment rendered in accordance with a jury verdict dismissing their claims against Dr. Gerald E. Stack and his insurer, Louisiana Medical Mutual Insurance Company. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On June 19, 2002, Pascha Madison presented at obstetrician Dr. Gerald E. Stack's office for her first pre-natal visit. Ms. Madison was referred to Dr. Stack through a program sponsored by Woman's Hospital called Better Beginnings, where a patient who does not have an obstetrician can contact Woman's Hospital, who then interviews the patient, draws lab work, and assigns her to a participating physician. At this initial consultation with Dr. Stack, he determined that based on Ms. Madison's reporting of her last menstrual cycle, she was twenty-six weeks pregnant and that her "due date" was September 26, 2002.[1] Dr. Stack conducted a review of Ms. Madison's past medical, family, and social history along with a review of symptoms. Ms. Madison related a history of having previously delivered a child by a vaginal delivery. She reported no problems or complications with her first pregnancy other than high blood pressure during the pregnancy. Further, she reported no problems or complications with the labor or delivery. Ms. Madison's physical exam was within normal limits, with the exception of morbid obesity at 320 pounds. Because Ms. Madison had expressed a desire for sterilization, they discussed that procedure during the visit. Also on that visit, Ms. Madison signed a consent form listing the risks and complications of vaginal delivery, vaginal delivery after a Cesarean Section, and Cesarean Section.
Dr. Stack also ordered a glucose tolerance screen, which was performed on July 8, 2002. The results of the glucose tolerance screen, while not diagnostic of gestational diabetes, revealed a borderline abnormal pattern. Dr. Stack subsequently ordered a three-hour glucose tolerance test, which was performed on August 9, 2002. The results of this test were abnormal. After Dr. Stack received these results, he scheduled an appointment for Ms. Madison on August 15, 2002, at Woman's Hospital Diabetic Counseling Center. At this appointment, Ms. Madison was placed on a specific diet and instructed how to check her blood sugar levels with a glucometer.
On August 21, 2002, Dr. Stack had an office visit with Ms. Madison. At that visit, Ms. Madison's weight had increased to 338 pounds. Dr. Stack instructed Ms. Madison to return to his office the next day for a non-stress test[2] to determine whether the fetus was doing well. The results of the August 22, 2002 non-stress test were reactive, indicating that the fetus was not experiencing any difficulty. At that point, Dr. Stack requested that Ms. Madison return to the office on Monday, August 26, 2002, for a repeat non-stress test and a biophysical profile (ultrasound) to determine fetal wellbeing and to calculate an estimated fetal weight based on certain measurements. Based upon this ultrasound, the baby's estimated fetal weight was between 4200 and 4300 grams or approximately nine and a half pounds.[3]
On August 28, 2002, Ms. Madison was admitted to the hospital at term for induction of labor secondary to insulin dependent diabetes and suspected fetal macrosomia.[4] Although Dr. Stack suspected that Ms. Madison was going to have a large baby and anticipated encountering shoulder dystocia,[5] considering that Ms. Madison had previously had a child, that she was at term, that her cervix was "favorable," and that she was dilated two to three centimeters, he concluded that Ms. Madison was an appropriate patient for an induction of labor. Dr. Stack induced labor and ordered an epidural anesthesia for Ms. Madison. During the course of the delivery, Dr. Stack decided to attempt to use forceps and took Ms. Madison to a delivery room where there were adequate personnel for assistance in the event that shoulder dystocia was encountered. Shoulder dystocia did present during the delivery and Dr. Stack reduced it using McRobert's Maneuver.[6] During the course of delivery, however, the baby sustained a brachial plexus injury to his right arm, which ultimately was determined to be permanent.[7]
The matter was submitted to a medical review panel to review the case and issue an opinion. The panel convened on July 29, 2004, and subsequently rendered an opinion finding that there was no breach of the standard of care for the treatment provided by Dr. Stack and, consequently, no medical malpractice. In its written reasons for opinion issued September 4, 2004, the panel stated as follows:
The panel recognizes that the patient in question did have risk factors for possible shoulder dystocia. The panel feels that Dr. Stack appropriately considered these risk factors. He was also faced with the fact that the patient was morbidly obese which presented its own set of risk factors regarding possible c-section and also that she had successfully delivered vaginally in the past and that she made normal progress during this labor. The shoulder dystocia was anticipated and managed in the appropriate fashion and therefore the panel feels there is no deviation from the standard of care. The panel also feels that Woman's Hospital and Nursing Staff did not deviate from the standard of care.
On August 24, 2004, plaintiffs filed the instant suit for damages against Dr. Stack and his insurer, Louisiana Medical Mutual Insurance Company. The case proceeded to a five-day trial before a jury on May 16, 17, 18, 22, and 23, 2007. At the close of defendants' case, plaintiffs moved for a directed verdict on the issue of lack of informed consent. The trial court took the matter under advisement, but did not rule on the motion prior to submitting the case to the jury for a decision.[8] After deliberation, the jury returned a verdict finding: (1) that Dr. Stack did not breach the standard of care during the delivery of J.W. causing injury to J.W.; and (2) that Dr. Stack did not fail to provide Ms. Madison with adequate informed consent, causing injury to J.W. A written judgment in conformity with the jury's verdict dismissing plaintiffs' claims was signed by the trial court on June 5, 2007.[9]
Plaintiffs now appeal, asserting the following two assignments of error:
(1) The trial court erred as a matter of law in denying plaintiffs' motion for directed verdict on the issue of informed consent; and
(2) The jury verdict was manifestly erroneous with regard to the finding of no breach of the standard of care and lack of informed consent.

DISCUSSION

Assignment of Error Number One
Plaintiffs first claim that the trial court erred as a matter of law in failing to grant plaintiffs' motion for a directed verdict on the issue of informed consent. Plaintiffs argue that it was not sufficient that Dr. Stack provide Ms. Madison with a written consent form without subsequently discussing with Ms. Madison the additional risks that she later developed.
Louisiana Code of Civil Procedure article 1810, which governs directed verdicts, provides as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. Wright v. Bennett, XXXX-XXXX (La. App. 1st Cir. 9/28/05), 924 So. 2d 178, 187. Generally, a motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Pratt v. Himel Marine, Inc., XXXX-XXXX (La. App. 1st Cir. 6/21/02), 823 So. 2d 394, 406, writs denied, 2002-2025, 2002-2128 (La. 11/01/02), 828 So. 2d 571, 572. And, if there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Rabalais v. St. Tammany Parish School Board, XXXX-XXXX, XXXX-XXXX (La. App. 1st Cir. 11/3/06), 950 So. 2d 765, 769, writ denied, 2006-2821 (La. 1/26/07), 948 So. 2d 177. The propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiffs claims. Rabalais v. St. Tammany Parish School Board, 950 So. 2d at 770.
In Louisiana, LSA-R.S. 40:1299.40 provides the methods of obtaining and proving informed consent of the patient. Jackson v. State, 2005-2021, 2005-2026 (La. 9/29/06), 938 So. 2d 688, 689 (per curiam). Pertinent to the instant case, LSA-R.S. 40:1299.40(A)(1) provides the method for obtaining a patient's written consent for medical treatment, as follows:
Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
(Emphasis added.)
Pursuant to LSA-R.S. 40:1299.40, if a written consent form is signed, a presumption of consent to encounter risks is established. Hondroulis v. Schuhmacher, 553 So. 2d 398, 417 (La. 1989). However, the patient has the right to overcome this presumption by showing that the consent was induced by misrepresentation. Hondroulis v. Schuhmacher, 553 So. 2d at 417. As set forth in the statute, however, (1) if it is proved that the patient signed a document purporting to warn him of a risk involved in the proposed surgery or treatment, (2) it is presumed that the patient understood and consented to encounter whatever risk a reasonable person, in what the doctor knew or should have known to be the patient's position, would have apprehended from the written consent form, and (3) the patient cannot disprove the presumed fact except by showing that his consent was induced by misrepresentation. Hondroulis v. Schuhmacher, 553 So. 2d at 417.
Interpreting LSA-R.S. 40:1299.40, in light of Hondroulis, the Third Circuit Court of Appeal has held that:
[I]f a written consent identifies the risk at issue, there is a presumption that the patient was informed of and accepted that risk, and the patient cannot introduce evidence to rebut that presumption, unless he proves that his `consent was induced by misrepresentation of material facts.' However, if the written consent does not identify the risk at issue, there is no presumption that the patient was informed of and accepted the risk at issue, and the physician must prove that he informed the patient of the risk at issue and that the patient consented to the surgery or procedure at issue.
Soileau v. Med-Express Ambulance Service, Inc., 2003-351 (La. App. 3rd Cir. 10/1/03), 856 So. 2d 92, 98, writ denied, XXXX-XXXX (La. 3/12/04), 869 So. 2d 816. (Citations omitted and emphasis added.)
The record herein includes a fully executed written consent form signed by Ms. Madison on June 19, 2002. The consent form is entitled, "Consent for Delivery and/or (VBAC) Vaginal Delivery After Previous Cesarean Section and Acknowledgment of Receipt of Information." The "Nature and Purpose of the Procedure" section of the consent form provides as follows:
Incomplicated [sic] deliveries are performed vaginally. Some patients who have previously had cesarean sections may be candidates for vaginal delivery. Very often an episiotomy (an incision near the vagina) is made in an effort to minimize tearing and stretching of the skin and muscle. If labor does not progress normally, however, augmentation of labor with medications may be indicated; and, in some instances, forceps or a vacuum extractor may be employed to assist in the delivery. Labor may be induced with medications in some post term pregnancies, in some cases in which there has been spontaneous rupture of membranes, and in other clinical situations. Cesarean section (in which the baby is delivered through surgical incisions in the abdomen and uterus) is necessary for some patients who have had previous cesarean sections, in cases of cephalopelvic disproportion, in some cases in which labor does not progress normally, in some cases in which the fetus is positioned abnormally, in some cases of fetal distress, and in other clinical situations.
The section of the consent form entitled, "Risks and Complications," provides, in part, as follows:
The fetal complications of vaginal delivery include: bruising; fractures of the baby's limbs and/or clavicle; nerve damage; infection; [cumonia];[10] pneumothorax and/or pneumomediastinum (abnormal collections of air around the lungs or heart); skull fracture; delivery of a premature infant; death; brain damage; quadriplegia (paralysis of both arms and legs); paraplegia (paralysis of both legs); loss of organ(s); loss of function of organ(s); and loss of function of arm(s) or leg(s), whether or not the cause is known.
(Emphasis added.)
When obtaining informed consent, technical language will not ordinarily suffice to disclose a risk to a layperson. A doctor is required to disclose material risks in such terms that a reasonable person in the patient's position would understand, unless the doctor knows or should have known something peculiar to the patient or her circumstances prevented her from understanding. Jackson v. State, 938 So. 2d at 690 (citing Hondroulis v. Schuhmacher, 553 So. 2d at 421).
After thorough review, however, we find that the consent form in this case provided language a reasonable person in Ms. Madison's position should understand. The various risks and complications of a vaginal delivery, and, in particular, the risks and injuries that were sustained herein, i.e., partial loss of function of an arm, were clearly identified in the consent form read and signed by Ms. Madison. Further, plaintiffs have not presented any evidence that would tend to prove that Dr. Stack should have known of any peculiarities that would have prevented Ms. Madison from understanding the provided language. Nonetheless, we note that the following introductory paragraph of the consent form clearly instructs Ms. Madison as to how to proceed in the event that she does not understand any provisions of the form:
Louisiana Revised Statute 40:12[99].40A requires that your physician obtain your [i]nformed consent to all medical and surgical treatment. What you are being asked to sign [i]s a confirmation that your physician has discussed the nature and purpose of and the alternatives to the proposed method of delivery and the associated risks, and that your physician has answered all of your questions [i]n a satisfactory manner. Please read the form carefully. Ask your physician about anything you do not understand. He or she will be pleased to explain.
Having determined that a reasonable person in Ms. Madison's position could understand the language in the consent form, we find that the written consent form herein specifically lists and adequately identifies the risks and injuries sustained herein. Thus, there is a presumption that Ms. Madison was informed of and accepted that risk, unless she proves that her consent was induced by misrepresentation of material facts. See Jackson v. State, 938 So. 2d at 690. Plaintiffs have failed to do so herein.
Plaintiffs also argue that Dr. Stack failed to disclose "additional risks" of shoulder dystocia after Ms. Madison was diagnosed with gestational diabetes and Dr. Stack suspected a macrosomic fetus. In support, plaintiffs rely on the disclosure requirements set forth in LSA-R.S. 40:1299.40(E)(7)(c).[11]
Subsections (E) and (F) of LSA-R.S. 40:1299.40 were enacted by Acts 1990, No. 1093, § 1, effective July 31, 1990. According to the stated purpose as set forth in the act, Subsections (E) and (F) were enacted "to provide for the creation of the Louisiana Medical Disclosure Panel; to grant the panel the authority to determine which risks and hazards of medical care and surgical procedures must be disclosed by a health care provider to patients; to establish the general form and substance of such disclosure; and to provide for related matters." Acts 1990, No. 1093. Reading the statute as a whole, by its own terms, LSA-R.S. 40:1299.40(E)(2)(b) explains that "[c]onsent to medical treatment may be evidenced according to the provisions of Subsections A and C of this Section or, as an alternative, a physician or other health care provider may choose to avail himself of the lists established by the Louisiana Medical Disclosure Panel pursuant to the provisions of this Subsection as another method by which to evidence a patient's consent to medical treatment." (Emphasis added.)
In the instant case, Dr. Stack obtained Ms. Madison's written consent for medical treatment in accordance with the provisions of Subsection A, which sets forth the requirements for valid written consent, not Subsection E. Moreover, we have determined that the written consent obtained herein is valid. Thus, we find plaintiffs' reliance upon LSA-R.S. 40: 1299.40(E)(7)(c) is misplaced as Dr. Stack established Ms. Madison's consent to medical treatment according to the provisions of Subsection (A).
To the extent that plaintiffs also argue that Dr. Stack should have obtained informed consent from Ms. Madison "to disclose the additional risks of shoulder dystocia" after Ms. Madison was diagnosed with gestational diabetes and a macrosomic fetus was suspected, we likewise find no merit. In so concluding, we must consider shoulder dystocia, the "risks" associated therewith, the chance of sustaining injury therefrom, and the chance of any injury sustained being permanent. Stated otherwise, in our analysis of informed consent, we must determine the materiality of the disclosure plaintiffs now contend the physician failed to make. See Thibodeaux v. Jurgelsky, 2004-2004 (La. 3/11/05), 898 So. 2d 299, 314.
A physician has a duty to disclose to a patient those risks that are "material." Hondroulis v. Schuhmacher, 553 So. 2d at 411. The determination of materiality is a two-step process. The first step is to determine the nature and existence of the risk and the likelihood of its occurrence. Jackson v. State, 938 So. 2d at 690. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. Thibodeaux v. Jurgelsky, 898 So. 2d at 314. The second prong of the materiality test is for the trier of fact to determine whether the probability of that type of harm is a risk which a reasonable person in the patient's position would consider in deciding on treatment. Thibodeaux v. Jurgelsky, 898 So. 2d at 314. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony. Thibodeaux v. Jurgelsky, 898 So. 2d at 314 (citing flondroulis v. Schuhmacher, 553 So. 2d 398, 412 (La. 1989)).
Published medical literature on shoulder dystocia, such as the practice guidelines published by the American College of Obstetricians and Gynecologists ("ACOG"), provides clinical management guidelines for obstetricians and gynecologists through its bulletins. Although these publications specify that they "should not be construed as dictating an exclusive course of treatment or procedure," they "are designed to aid practitioners in making decisions about appropriate obstetric and gynecologic care" and are commonly accepted as the standard of care in the obstetrical community.
As set forth in ACOG Practice Bulletin Number 40, entitled "Shoulder Dystocia," published in November 2002:
Shoulder dystocia is most often an unpredictable and unpreventable obstetric emergency. Failure of the shoulders to deliver spontaneously places both the pregnant woman and fetus at risk for injury. Several maneuvers to release impacted shoulders have been developed, but the urgency of this event makes prospective studies impractical for comparing their effectiveness. The purpose of this document is to provide clinicians with information based on published studies regarding management of deliveries at risk for or complicated by shoulder dystocia.
* * *
Brachial plexus injuries and fractures of the clavicle and humerus are associated with shoulder dystocia. The reported incidence of brachial plexus injuries following a delivery complicated by shoulder dystocia varies widely from 4% to 40%.... Fortunately, most cases resolve without permanent disability; that is fewer than 10% of all cases of shoulder dystocia result in a persistent brachial plexus injury.... Data suggest that a significant proportion (34-47%) of brachial plexus injuries are not associated with shoulder dystocia; in fact, 4% occur after cesarean delivery.
The bulletin further explains that although severe cases are readily apparent, milder forms may be over diagnosed or under diagnosed.
According to ACOG Practice Bulletin Number 40, fetal macrosomia and maternal diabetes are factors that can increase the risk of shoulder dystocia. However, as stated therein, a substantial proportion of shoulder dystocia cases occur among women who do not have diabetes and among infants with birth weights of less than 4000 grams. The bulletin further cites to one study where the presence of both diabetes and macrosomia accurately predicted only 55% of cases of shoulder dystocia. Moreover, the bulletin states that additional studies failed to find any combination of risk factors that could accurately predict which pregnancies would be complicated by shoulder dystocia. Importantly, however, and pertinent to the facts in the instant case, ACOG recommends that "[a]lthough the diagnosis of fetal macrosomia is imprecise, prophylactic cesarean delivery may be considered for suspected fetal macrosomia with estimated fetal weights greater than 5,000 [grams] in women without diabetes and greater than 4,500 [grams] in women with diabetes." (Emphasis added.) According to ACOG Practice Bulletin Number 22, published in November 2000, and entitled "Fetal Macrosomia," the term "fetal macrosomia" implies growth beyond a specific weight, usually 4000 grams to 4500 grams regardless of gestational age. The bulletin states that the most serious complication of fetal macrosomia is shoulder dystocia. It further explains, "[f]ortunately, shoulder dystocia is rare, complicating only 1.4% of all vaginal deliveries ... In the presence of maternal diabetes, birth weights greater than 4,500 [grams] have been associated with rates of shoulder dystocia from 19.9% to 50%." The bulletin confirms that while macrosomia clearly increases risk, most instances of shoulder dystocia occur unpredictably among infants of normal birth weight.
ACOG Practice Bulletin Number 30, published in September of 2001, discusses gestational diabetes. According to the bulletin, gestational diabetes is characterized as carbohydrate intolerance that begins or is first recognized during pregnancy. The offspring of women with gestational diabetes are prone to such adverse events as macrosomia with its potential complications. Infants of women with gestational diabetes are at increased risk for operative delivery, shoulder dystocia, and birth trauma. When patients are able to control their glucose and no other complications supervene, there is no good evidence to support routine delivery before 40 weeks of gestation. Moreover, there is no data to support a policy of Cesarean delivery purely on the basis of gestational diabetes. ACOG provides the following explanation in the bulletin:
On the basis of available data, it is not possible to determine whether the potential benefits of cesarean delivery without labor at a given estimated fetal weight are similar for patients with [gestational diabetes] and those with preexisting diabetes. It would appear reasonable to recommend that patients with [gestational diabetes] be counseled regarding possible cesarean delivery without labor when the estimated fetal weight is 4,500 [grams] or greater. When the estimated weight is 4,000-4,500 [grams], additional factors such as the patient's past delivery history, clinical pelvimetry, and the progress of labor may be helpful to consider in determining mode of delivery.
ACOG acknowledges in the bulletin, however, that one of the problems in trying to apply such a threshold is the poor accuracy of ultrasound prediction of fetal birth weight.
Williams Obstetrics, 20th Edition, a text book considered as authority on obstetrical and gynecological issues, also discusses shoulder dystocia in Chapter 18, entitled "Dystocia: Abnormal Presentation, Position, and Development of the Fetus." Williams identifies several recognized maternal risk factors, including obesity, multiparity, and diabetes. Williams explains that these factors "exert their effects" because of associated increased birth weight. Williams cites a 1991 study which identified shoulder dystocia in 7% of pregnancies complicated by gestational diabetes. After reviewing several studies, Williams found that the common thread running through all current reports on risk factors for shoulder dystocia is increased birth weight.
With reference to management, Williams states that "[b]ecause shoulder dystocia cannot be predicted, the practitioner of obstetrics must be well versed in the management principles of this occasionally devastating complication." Williams summarizes, "[t]he preponderance of most current evidence is consistent with the view that (1) risk factors for shoulder dystocia have no predictive value, (2) shoulder dystocia is an unpredictable event, and (3) infants at risk for permanent injury are impossible to predict." Cunningham, MacDonald, Gant, Leveno, Gilstrap, Hankins, and Clark, Williams Obstetrics, 451, (20th Ed.).
Also introduced into evidence at trial was an article published in the November 13, 1996 edition of the Journal of the American Medical Association (Vol. 276, No. 18) entitled, "The Effectiveness and Costs of Elective Cesarean Delivery for Fetal Macrosomia Diagnosed by Ultrasound," and authored by Dr. Dwight J. Rouse, Dr. John Owen, Dr. Robert L. Goldenberg, and Dr. Suzanne P. Cliver. According to the article, based on their compilation of multiple studies and research, the percentage of expected diabetic mothers with estimated fetal weights of 4000-4499 grams who actually encounter shoulder dystocia is 0.139. The percentage of babies with estimated fetal weights of 4000-4499 grams who sustain a brachial plexus injury after encountering a shoulder dystocia is 0.18. Moreover, their research showed that the percentage of all brachial plexus injuries resulting in permanent injury is 0.067.
Given the above information concerning shoulder dystocia, and Ms. Madison's diagnosis of gestational diabetes and estimated fetal birth weight of 4200 to 4300 grams, we now consider the two-pronged test to determine whether the risk of shoulder dystocia and a permanent injury resulting therefrom is material. See Jackson v. State, 938 So. 2d at 690.
In this case, Dr. Stack explained that on August 28, 2002, the date Ms. Madison was scheduled for induction of labor, he was faced with multiple considerations: the patient had previously delivered a baby vaginally at term and had a proven pelvis; the patient was a gestational diabetic; she had what was classified as a macrosomic baby; her cervix was "favorable" and she was dilated two to three centimeters. Thus, Dr. Stack opined that she would take favorably to an induction of labor. Dr. Stack testified that once the shoulder dystocia presented, and he was aware of it as an actual event, he used the normal mechanisms of reducing it. Dr. Stack further testified that he did not use excessive force in the delivery of the shoulders in this case. He stated that he used the force necessary to deliver the shoulder, as is done in any delivery. Dr. Stack explained that the reduction of the shoulder dystocia, in his opinion, was not that difficult. He reduced it with the "simple" McRobert's Maneuver. Dr. Stack testified that there were other maneuvers that could have been performed if McRobert's had not been successful, but that none were necessary in this case. By his own calculations, he figured that there was a 15% probability of encountering a shoulder dystocia. Dr. Stack further noted that although he did not offer Ms. Madison a Cesarean section because he felt it was not indicated, he was faced with weighing the risk of the baby versus the risks to the mother in performing a Cesarean section.
Dr. Stack contended that the threshold requirements for a discussion with the patient of whether a Cesarean section would be preferable were not met herein. Specifically, he noted that according to Ms. Madison's ultrasound report, performed two days before the induction of her labor, the estimated fetal weight was 4200 to 4300 grams, which was below the established criteria of 4500 grams or above, for mothers with gestational diabetes. Dr. Stack explained that he had to act on the information that was available to him at the time, which was that the baby was 4200 to 4300 grams, and that he made his decisions based on that information. Ms. Madison had simply not reached the established "cutoff point" where a discussion concerning a possible Cesarean section would have been necessary.
The ACOG clinical practice guidelines and the recommendations contained therein, as well as the recommendations in Williams Obstetrics and Dr. Rouse's article, were discussed by the expert witnesses who provided testimony before the jury at trial. Plaintiffs called the three physician members of the medical review panel, Dr. Dawn Knight, Dr. Steven D. Feigley, and Dr. Edward Schwartzenburg, to testify at trial.
Dr. Knight, a board-certified obstetrician and gynecologist, agreed that in most instances a physician cannot anticipate a shoulder dystocia during labor and delivery, and that it is not possible to determine when it will occur. When asked if Ms. Madison was provided with any information, including alternative modes of treatment and objectives and the risk, benefits, and possible complications of such treatment, Dr. Knight stated that based on her review of the records in this case, she did not know. Thus, her testimony provides limited assistance in determining whether there was a breach of the standard of care or failure to provide sufficient information for consent.
Dr. Steven D. Feigley, also a board-certified obstetrician and gynecologist, was accepted by the trial court as an expert in the field of gynecology and obstetrics. Dr. Feigley testified that he was also familiar with ACOG Practice Bulletin No. 40 on shoulder dystocia and considered it a reliable authority for obstetricians. Dr. Feigley believed that the ACOG recommendations represented or set forth a standard of care. Dr. Feigley did not feel like the circumstances that occurred in Ms. Madison's case were any reason to consider departing from the standard of care. Dr. Feigley stated that the "bottom line" is that shoulder dystocia is an unpredictable event, and that until the fetus's weight is 4500 grams, a physician must balance and manage how things are proceeding. After his review of this case, Dr. Feigley opined that the factors present in Ms. Madison's case did not meet the threshold for consideration or recommendation of Cesarean section. Dr. Feigley noted that shoulder dystocia can rarely be predicted. He further stated that the majority are quite easy to resolve, and the ones that are difficult to resolve are quite rare. Dr. Feigley testified that if he felt there was a small chance of an easily reducible shoulder dystocia, he would still attempt a vaginal delivery. Moreover, Dr. Feigley noted the increased risk factors of performing a Cesarean section, particularly with an obese patient.
In reference to the nature and existence of the risk and the likelihood of its occurrence, Dr. Feigley explained that just because there is a chance of shoulder dystocia does not necessarily mean that there is a chance of injury. He opined that shoulder dystocia in and of itself is not an injury; it is instead an "event" that physicians have various maneuvers to manage. He further noted that the majority of shoulder dystocias do not result in brachial plexus injuries, and that of those that do, over 90% of those injuries resolve. Thus, the chance of a permanent injury resulting is a very low number, i.e., less than half a percent or less than a tenth of a percent. According to Dr. Feigley, a permanent injury resulting is unlikely; not probable.
Dr. Edward Schwartzenburg, also a board-certified obstetrician and gynecologist, was also accepted by the trial court as an expert in the field of gynecology and obstetrics. Dr. Schwartzenburg stated that because shoulder dystocias cannot accurately be predicted, even when faced with multiple risk factors, physicians are provided with guidelines and recommendations for the management of shoulder dystocia. Dr. Schwartzenburg testified that according to the guidelines and recommendations provided by ACOG, which most obstetricians consider to represent an accepted standard of care, in a situation with a diabetic patient, where the fetal weight is over 4500 grams, you may consider discussing a Cesarean section with the patient. Dr. Schwartzenburg stated that in this case, where the estimated fetal weight was 4200 to 4300 grams, the threshold for such discussion was not met.
In reference to the nature and existence of the risk and the likelihood of its occurrence, Dr. Schwartzenburg testified that the risk of permanent injury from a shoulder dystocia is impossible to predict. Dr. Schwartzenburg further noted concern for the heightened risks of performing a Cesarean section on a 330-pound patient, including excessive bleeding, infection, blood clots, pulmonary complications, and potential injury to the bladder.
Plaintiffs further presented the testimony of Dr. C. Paul Sinkhorn, a board-certified obstetrician and gynecologist, who was accepted by the trial court as an expert in the field of obstetrics and gynecology. Dr. Sinkhorn opined that the written informed consent form that Ms. Madison signed on June 19, 2002, was insufficient in this case. He explained that the informed-consent procedure should be near the time of the event in order to be considered valid. Dr. Sinkhorn testified that once Dr. Stack diagnosed fetal macrosomia in a diabetic patient, he should have had a discussion with Ms. Madison concerning the risks of vaginal delivery versus the risks of Cesarean section. Dr. Sinkhorn opined that given the clinical circumstances of diabetes and maternal obesity, the shoulder dystocia encountered herein was predictable and preventable. Dr. Sinkhorn concluded that there was at least a 95% chance that the injury was preventable had a Cesarean section been performed.
The defendants presented the testimony of Dr. Henry Lerner, a board-certified obstetrician and gynecologist. The parties stipulated to his qualifications as an expert in the field of obstetrics and gynecology. Dr. Lerner has published articles on shoulder dystocia and has an Internet web page that discusses shoulder dystocia. He also has lectured on the topic. Dr. Lerner stated he is familiar with the ACOG practice guidelines and has received official recognition from ACOG about his expertise on shoulder dystocia. Dr. Lerner testified that by and large, the ACOG recommendations are what most physicians follow, and to that extent, they are the standard of care. Dr. Lerner testified that ACOG recognizes and discusses the imprecise nature of ultrasound readings of fetal weight. He stated that ACOG takes this into consideration in establishing the 4500-gram threshold for discussion of Cesarean sections for diabetics. After review of this case, Dr. Lerner opined that the ACOG recommendations were not actually applicable in this case, because the best information that Dr. Stack had was that the baby was going to weigh 4200 to 4300 grams. Thus, he concluded that Dr. Stack had no duty to discuss with Ms. Madison whether a Cesarean section would be preferable in this case. Dr. Lerner further noted that there are no combinations of risk factors that can allow a physician to accurately predict shoulder dystocia, and that whether a physician appropriately treated a patient cannot be evaluated in retrospect. He characterized such an evaluation as "Monday morning quarterbacking."
In terms of the risks of shoulder dystocia, Dr. Lerner testified that the risk of having a shoulder dystocia in a non-diabetic patient is 1%. In a diabetic patient with a bigger baby, some studies say the risk is 10 to 15 to 17%. However, of those, only 10 to 15% will sustain even a temporary injury, and of those injuries, only 10 to 15% will be permanent. Thus, he opined, with a patient like Ms. Madison, who weighs approximately 340 pounds and has diabetes, and where Cesarean surgery is not easy because of her heightened risk for infection, pneumonia, pulmonary embolus, and wound could dehist (come apart because of her obesity and her diabetes), a physician would have to operate 450 times on a woman in those circumstances to avoid one brachial plexus injury (which he explained is approximately 1/5 of 1%).
Dr. Lerner concluded that "[i]f one is standing in Dr. Stack's shoes in the hours before delivery, there is a 99.8 percent chance in that circumstance that this baby will not have a permanent brachial plexus injury." Dr. Lerner further testified that he would not have recommended a Cesarean section in this case and that ACOG would not have recommended so either. He stated this would not have been the correct thing to do.
Given the expert testimony presented at trial concerning the likelihood of the occurrence of a permanent brachial plexus injury resulting from a shoulder dystocia in this case, and considering the significant risk posed to Ms. Madison if a Cesarean section had been performed, we are unable to find that the risks herein were so "material" that Dr. Stack had a duty to deviate from the literature and accepted standards of care. As Dr. Lerner pointed out, if Dr. Stack had not followed ACOG guidelines and instead performed a Cesarean section, if Ms. Madison had developed a blood clot in her leg that went to her brain and caused a stroke, or developed injuries from any of the other potential complications, such surgery would have constituted a breach of the standard of care.
Having determined that the statistics and other evidence presented establish that the risk of sustaining a permanent brachial plexus injury was so slim that the risk was not "material,"[12] we do not reach the second prong of the two-pronged materiality test.[13]
After thorough review, given the testimony and evidence, we find the facts and inferences are not so overwhelmingly in favor of plaintiffs that reasonable men could not arrive at a contrary verdict. The accepted standard of care did not require Dr. Stack to obtain additional informed consent from Ms. Madison once it was determined that Ms. Madison had gestational diabetes and the fetus was macrosomic. Thus, we find no abuse of discretion by the trial court in failing to grant plaintiffs' motion for directed verdict.
This assignment lacks merit.

Assignment of Error Number Two
Plaintiffs next challenge the jury's verdict, which found that Dr. Stack did not breach the standard of care during delivery and did not fail to provide Ms. Madison with adequate informed consent. Plaintiffs contend that considering the evidence as a whole, the jury's findings are manifestly erroneous and should be reversed.
In order to reverse a fact-finder's determination, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the factfinder is clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So. 2d 880, 882 (La. 1993).
It is well settled that a court of appeal may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So. 2d at 882; Rosell v. ESCO, 549 So. 2d 840, 844 (La. 1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even if the appellate court believes that its inferences and evaluations are as reasonable. Rosell v. ESCO, 549 So. 2d at 844. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Pinsonneault v. Merchants & Farmers Bank & Trust Company, 2001-2217 (La. 4/3/02), 816 So. 2d 270, 279. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So. 2d at 844.
A court of appeal may find manifest error only where documents or objective evidence so contradict a witness' testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the testimony, even where the finding is purportedly based on a credibility determination. Rosell v. ESCO, 549 So. 2d at 844-845. But where this situation does not exist, and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So. 2d at 845.
In reviewing a jury's determination regarding whether or not a doctor obtained the patient's informed consent, an appellate court should focus on the duty of the doctor to provide material information to the patient under the circumstances of the particular case. Thibodeaux v. Jurgelsky, 898 So. 2d at 316. For the reasons set forth previously in our discussion upholding the trial court's refusal to grant plaintiffs' motion for directed verdict on the issue of informed consent, we likewise find no error with the jury's finding that Dr. Stack provided Ms. Madison with adequate information to obtain informed consent.
The jury obviously credited the testimony of Drs. Feigley, Schwartzenburg, Lerner, and Stack over that of Dr. Sinkhorn in finding that Dr. Stack provided Ms. Madison with adequate information herein and that the threshold circumstances warranting additional discussion of a Cesarean section were not met. On review, when we are faced with two views of the evidence, we may not re-weigh the evidence or substitute our own factual findings for that of the jury or find the jury's choice between them clearly wrong. See Pinsonneault v. Merchants & Farmers Bank & Trust Company, 816 So. 2d at 279; Rosell v. ESCO, 549 So. 2d at 844. Accordingly, we find no error in the jury's determination that Dr. Stack did not fail to provide Ms. Madison with appropriate information to obtain adequate informed consent.
Lastly, we reject as meritless plaintiffs' contention that the jury erred in finding that Dr. Stack did not breach the applicable standard of care during delivery.
In a medical malpractice case, a plaintiff has the burden of proving the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances. Further, where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, the plaintiff also has the burden of proving: (1) the degree of care ordinarily practiced by physicians within the involved medical specialty; (2) that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and (3) that as a proximate result of this lack of knowledge or skill, or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have been incurred. LSA-R.S. 9:2794(A). In sum, plaintiffs must establish the standard of care applicable to the physician, a violation by the physician of that standard of care, and a causal connection between the physician's alleged negligence and the plaintiff's injuries. Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La. 10/17/94), 643 So. 2d 1228, 1233.
To meet this burden of proof; plaintiffs are generally required to produce expert medical testimony. Boudreaux v. Mid-Continent Casualty, 2005-2453 (La. App. 1st Cir. 11/3/06), 950 So. 2d 839, 844, writ denied, 2006-2775 (La. 1/26/07), 948 So. 2d 171. Although the jurisprudence has recognized exceptions in instances of obvious negligence, those exceptions are limited to instances in which the medical and factual issues are such that a lay person can perceive negligence in the charged physician's conduct as well as any expert can. Pfiffner v. Correa, 643 So. 2d at 1233-1234. The jurisprudence has thus recognized that an expert witness is generally necessary as a matter of law to prove a medical malpractice claim. Boudreaux v. Mid-Continent Casualty, 950 So. 2d at 844.
The established standard of care herein, as discussed above and as agreed upon and accepted by Drs. Lerner, Schwartzenburg, and Feigley, i.e., every expert physician in this case who testified regarding the standard of care, except plaintiffs' expert, Dr. Sinkhorn,[14] is the ACOG recommendation that "[a]lthough the diagnosis of fetal macrosomia is imprecise, prophylactic cesarean delivery may be considered for suspected fetal macrosomia with estimated fetal weights greater than 5,000 [grams] in women without diabetes and greater than 4,500 [grams] in women with diabetes." (Emphasis added.)
In this delivery, Dr. Stack used the guidelines recommended by ACOG, i.e., that a threshold value of greater than 4500 grams in a diabetic mother triggers the need for a discussion or consideration of a Cesarean section. Dr. Stack testified that given the estimated fetal weight of 4200 to 4300, as provided by Ms. Madison's ultrasound conducted two days prior to delivery, the threshold for that pivotal point in his management of her labor and delivery was simply not met.
Dr. Feigley testified that he believed the ACOG recommendations are the standard of care, and that given the circumstances and risk factors presented in Ms. Madison's case, the threshold to consider or recommend a Cesarean section was not met. Thus, he opined, Dr. Stack did not breach the applicable standard of care.
Dr. Schwartzenburg testified that Dr. Stack's treatment of Ms. Madison complied with the standard of care as established by the ACOG practice guidelines and recommendations. He opined that the treatment by Dr. Stack was appropriate, and that if he were faced with the same situation, he likewise would not have recommended a Cesarean section. Instead, Dr. Schwartzenburg testified, he would have proceeded "exactly" as Dr. Stack did.
Dr. Lerner testified that from his review of this case, he felt Dr. Stack provided care that was well within the standard of care of the average competent well-trained obstetrician in the United States. Dr. Lerner opined that the standard of care is what the majority of well-trained obstetricians would do and agreed that the ACOG recommendations are what most physicians follow. Nonetheless, he did not find that the recommendation for when to discuss and consider a Cesarean section was even applicable in this case, because the best information Dr. Stack had before the delivery was that the baby was going to weigh 4200 to 4300 grams. Dr. Lerner testified that Dr. Stack made the right decision according to ACOG and that he practiced within the standard of care in the decision that he made.
Dr. Sinkhorn, on the other hand, opined that based on his review, there was substandard care by Dr. Stack. He believed that Dr. Stack's failure to discuss the risk of vaginal delivery versus Cesarean section after Ms. Madison was diagnosed with gestational diabetes and suspected fetal macrosomia fell below the standard of care. Moreover, Dr. Sinkhorn stated that Dr. Stack's actions, when faced with a clinical situation where the baby was not delivering, of persisting and using forceps, rather than offering Ms. Madison a Cesarean section, fell below the standard of care.
Where the testimony of expert witnesses differs, it is the responsibility of the trier of fact to determine which evidence is most credible. The jury in this case heard the testimony of all of the expert witnesses, and apparently chose to credit the trial testimony of Drs. Lerner, Schwartzenburg, and Feigley over the deposition testimony of Dr. Sinkhorn. On review of the record in its entirety, we find that a reasonable basis exists therein for the factual findings of the jury. Thus, we find no manifest error in the jury's determination that Dr. Stack's conduct did not fall below the applicable standard of care.
Accordingly, we likewise find no merit to this assignment of error.

CONCLUSION
For the above and foregoing reasons, the June 5, 2007 judgment of the trial court is affirmed. Costs of this appeal are assessed against plaintiffs/appellants, Pascha Madison and James W. Scott, Jr., individually and on behalf of their minor son, James W. Scott, III.
AFFIRMED.
NOTES
[1] As a result of a later ultrasound, Ms. Madison's "due date" was subsequently revised to September 1, 2002.
[2] In a non-stress test, the patient is placed on a fetal monitor to monitor the fetus's heart rate and to search for a reactive pattern. Three accelerations of fifteen beats per minute that are maintained for at least fifteen seconds are indicative that the fetus is doing well.
[3] The ultrasound report is incorrectly dated Sunday, August 25, 2002. The actual date of the ultrasound was Monday, August 26, 2002.
[4] "Fetal Macrosomia" implies a large baby, usually 4000 grams or 4500 grams. regardless of the gestational age.
[5] As we will discuss in further detail, "shoulder dystocia" is basically an event that presents during a vaginal delivery whereby the baby's shoulder gets "hooked" on the symphysis pubis or the pubic bone.
[6] McRobert's Maneuver is a mechanism performed to reduce the shoulder dystocia once it presents. In this maneuver, the patient's thighs are flexed back across her abdomen while suprapubic pressure is applied to attempt to reduce the anterior shoulder while the delivering physician applies downward traction on the head to deliver the anterior shoulder.
[7] As a result of the brachial plexus injury, the baby's C-5 and 6 nerves that control his right shoulder in the deltoid area were affected. The child ultimately had surgery on his right arm and shoulder to improve his ability to lift his arm.

At the time of trial, J.W. had full function of his right hand, which includes full function of all fingers and his thumb, and had full function of his wrist. However, he lacked some extension with his elbow, but was able to use it. Moreover, he was able to extend his arm, but lacked a "little bit" of range. He had good range of elbow by active range of motion within functional limits. J.W. has 95° range of flexion and can achieve 130° range of flexion with the aid of his trunk to lift his right arm.
[8] For purposes of our review, we consider the trial court's action of submitting the case to the jury for deliberation to be an implicit denial of plaintiffs' motion for directed verdict. See generally Barham & Arceneaux v. Kozak, 2002-2325 (La. App. 1st Cir. 3/12/04), 874 So. 2d 228, 241. writ denied, XXXX-XXXX (La. 6/4/04), 876 So. 2d 87. 1st Cir.
[9] Plaintiffs filed a motion for JNOV and/or new trial, which was heard by the trial court on July 30, 2007. At the hearing, plaintiffs withdrew their motion for new trial, and the trial court denied their motion for JNOV.
[10] The copies of the consent form found in the record omit the text along the edge of the left margin. Thus, we are unable to determine the exact spelling of this word.
[11] Louisiana Revised Statute 40:1299.40(E)(7)(c) provides as follows:

In order to be covered by the provisions of this Subsection, the physician or other health care provider who will actually perform the contemplated medical or surgical procedure shall:
(i) Disclose the risks and hazards in the form and to the degree required by the panel;
(ii) Disclose additional risks, if any, particular to a patient because of a complicating medical condition, either told to the physician or other health care provider by the patient or his representative in a medical history of the patient or reasonably discoverable by such physician or other health care provider;
(iii) Disclose reasonable therapeutic alternatives and risks associated with such alternatives;
(iv) Relate that he is obtaining a consent to medical treatment pursuant to the lists formulated by the Louisiana Medical Disclosure Panel; and
(v) Provide an opportunity to ask any questions about the contemplated medical or surgical procedure, risks, or alternatives and acknowledge in writing that he answered such questions, to the patient or other person authorized to give consent to medical treatment, receipt of which shall be acknowledged in writing.
[12] We also note that Dr. Leslie Bostick, J.W.'s pediatrician, testified that she has had quite a bit of experience with brachial plexus injuries as a pediatrician and that brachial plexus injuries are quite common at birth. In her experience as a board-certified pediatrician since 1991, over 90% of these injuries usually resolve in the first year. In fact, she testified that J.W. is the only case she has ever had where the injury did not resolve.
[13] Nonetheless, we note that even if we were to assume that the risk of permanent injury should have been disclosed to Ms. Madison, given the increased risks and complications of Cesarean section under the circumstances herein, we have serious doubts as to whether a reasonable person in Ms. Madison's position would have opted for a Cesarean section. See Jackson v. State, 938 So. 2d at 690.
[14] To the extent that Dr. Sinkhorn opined that Dr. Stack breached the applicable standard of care in this case, we note that Dr. Sinkhorn is a member of ACOG, and testified that he would not use ACOG as the "word authority," but considered it is a reliable source. He further testified that he did not believe that ACOG was an accepted standard of care, but subsequently acknowledged that if a physician followed the guidelines and recommendations of ACOG, they have complied with the accepted standard of care. Dr. Sinkhorn also testified that he did not consider Williams Obstetrics as an "authority" but considered it as a reliable source.